2019 IL App (1st) 160983

FIRST DISTRICT
THIRD DIVISION
May 29, 2019

No. 1-16-0983

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 11953 |
| | ) | |
| NICHOLAS CALLOWAY, | ) | Honorable |
| | ) | Michael Joseph Kane, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment and opinion.

**OPINION**

¶ 1    The police entered an apartment to execute a search warrant and found defendant Nicholas Calloway running toward the back exit, carrying two bags of cannabis. There was a gun on the couch, immediately inside the front door, about 15 feet away from where defendant was seen running when the first officer entered. The police secured the gun on the couch, pursued defendant out the back, and arrested him in another apartment downstairs. A jury convicted defendant of armed violence, the predicate offense of possession of cannabis with intent to deliver, and armed habitual criminal.

¶ 2    Defendant raises several issues on appeal. We reverse his conviction for armed violence based on one of them. Defendant argues, and we agree, that the State failed to prove that he was "armed," within the meaning of the statute, because the gun on the couch was not immediately accessible to him when the police entered the apartment. We affirm defendant's convictions for

possession of cannabis and armed habitual criminal over his contentions of ineffective assistance of counsel.

¶ 3                                    BACKGROUND

¶ 4      On May 9, 2009, Chicago police officers arrested defendant while executing a search warrant at 7123 S. Campbell Avenue. Officers Walsh, Dougherty, and Bokowski, and Sergeants Johnson and Gade, all of whom testified for the State, were among the eight officers who entered the second-floor apartment in the two-flat building at that address.

¶ 5      The officers' testimony and accompanying exhibits described some salient features of the apartment's layout. The front door opens directly into the living room. The next room back is the adjoining dining room. The back bedroom is behind the dining room. There was at least one other bedroom, toward the front of the apartment, adjacent to the living room.

¶ 6      The officers forcibly entered the building and went upstairs to the second-floor unit. They knocked and announced their presence. When nobody answered after five to six seconds, they broke down the door with a battering ram and went inside.

¶ 7      There was a gun on the couch in the living room, immediately inside and just to the right of the front door. Apart from the gun, the couch was unoccupied. Johnson immediately secured the gun on the couch while the rest of the officers cleared the apartment.

¶ 8      Bokowski, the first officer to enter the apartment, testified that he did not see anyone in the living room. But he saw defendant, in a "side profile," about 15 feet away, either "inside" or "approaching" the dining room, and "fleeing towards the back of the apartment." Walsh testified that he saw defendant "fleeing from the living room into the kitchen area." Dougherty testified that he did not see anyone at first. But then he heard another officer say "he's running, he's running," and he noticed defendant "running through the apartment," specifically in "the dining

room area." Neither Johnson nor Gade saw defendant at all. Other than defendant, there was nobody in the apartment.

¶ 9     Defendant was dressed in a T-shirt and boxer shorts. He was carrying two Crown Royal bags. Walsh and Dougherty pursued defendant as he ran to the back of the apartment, out the rear exit, down the rear stairwell, and into the first-floor apartment, where he tossed the Crown Royal bags onto a bed. There, defendant was arrested. Walsh opened the Crown Royal bags and found small plastic bags—26 in one bag and 31 in the other—filled with suspected cannabis. Walsh returned to the second-floor apartment. Dougherty soon followed with defendant in tow.

¶ 10     The officers searched the entire second-floor apartment. In the dining room, they found another small plastic bag with suspected cannabis, a digital scale, and a Western Union receipt bearing defendant's name but no address. A total of 55 live .22-caliber rounds (to match the loaded semi-automatic found on the couch) were found throughout the apartment—in the dining room, in the front bedroom, and under the sofa cushion in the living room. In the rear bedroom, Walsh found a pair of jeans and some gym shoes, which he gave to defendant so he could get dressed. A set of keys found in the pocket of the jeans matched the lock on the front door of the second-floor apartment. The officers did not find any other items clearly belonging to defendant or linking him to the property.

¶ 11     During the search, Dougherty spoke to defendant in the living room. After Mirandizing defendant, Dougherty asked why he had the gun. Defendant answered, "People be fittin' to kill me so I need protection." Defendant never signed a written statement, but Dougherty recorded defendant's response in his case report.

¶ 12    Using both microscopic and chemical analyses, a forensic chemist from the Illinois State Police confirmed that the substances packaged in the small plastic bags were cannabis. The samples weighed by the chemist totaled approximately 41 grams.

¶ 13    The parties stipulated that the ridge impressions found on the gun were not suitable for comparison, and that defendant had two qualifying convictions for the charge of armed habitual criminal.

¶ 14    Sergeant Kappel of the Evidence and Recovered Property Section testified that in the spring of 2013 (defendant was arraigned in July 2009 and tried in January 2016), the narcotics vault became wet and some of the inventoried items—including the cannabis recovered in this case—started to rot. On May 24, 2013, Kappel made an administrative decision to have the rotting cannabis destroyed, out of fear that it would pose a health risk to the officers working in the building. In total, about 4000 items from the vault were destroyed, many on account of such health risks, and others because the underlying cases had been adjudicated.

¶ 15    In August 2013, the digital scale and keys recovered during the search were discarded from the evidence vault. Kappel did not know why, but he testified to his "assumption": That someone in the evidence section, researching the inventoried items, noticed that the cannabis had been destroyed, assumed that the case was over, and discarded the keys and scale "without checking further."

¶ 16    At trial, the State showed the jury photos of the destroyed items, taken by Gade, depicting how they appeared when they were seized during the search.

¶ 17    The record shows that the State informed defense counsel that this evidence had been destroyed at a pretrial hearing on July 30, 2014. Counsel did not file any motions in response. At the close of the State's case, however, counsel filed a motion for directed finding. As to the

cannabis charge, that motion was based on "the fact that there is no longer any cannabis and there is no way we can bring it out, or show it or even take a test of it." The motion was denied.

¶ 18    Defendant took the stand on his own behalf. He testified, in sum, that he was in the first-floor apartment at 7123 S. Campbell Avenue when the officers arrived, checking on his aunt's boyfriend, who was ill at the time, while his aunt was out of town. Defendant heard some loud noises and realized the police were upstairs. He opened the back door of the first-floor apartment and was met by officers who told him to get down. The officers searched the first-floor apartment, took defendant upstairs, and strip-searched him. The officers found the Western Union receipt, which they claimed to find in the dining room of the second-floor apartment, in his pocket. Defendant denied ever seeing the Crown Royal bags or admitting to the officers that the gun on the couch was his.

¶ 19    After the jury found defendant guilty, the trial court sentenced him to 16 years in prison for armed violence, 7 years for armed habitual criminal, and 3 years for possession of cannabis with intent to deliver, with all sentences to run concurrently. This appeal followed.

¶ 20                                    ANALYSIS

¶ 21                              I. Armed Violence

¶ 22    Defendant first argues for a reversal of his conviction for armed violence. He contends, in particular, that he was not "armed," within the meaning of the statute, because the gun was not immediately accessible to him when the police entered the apartment.

¶ 23                        A. Immediate Access to Weapon

¶ 24    To prove the offense of armed violence, the State had to prove that defendant committed a predicate felony (namely, possession of cannabis with intent to deliver) "while armed with a dangerous weapon." 720 ILCS 5/33A-2(a) (West 2008). In construing this element, our supreme

court has explained that a felon with immediate access to a dangerous weapon may have to make a "spontaneous" decision whether to use deadly force—and thus will be more likely to spark a violent encounter—when faced with resistance from a police officer, victim, or another criminal. *People v. Harre*, 155 Ill. 2d 392, 395 (1993); *People v. Condon*, 148 Ill. 2d 96, 109-10 (1992). The purpose of the armed-violence statute is to minimize the risk of such violence by disarming felons, thus eliminating the need for them to decide, in the heat of the moment, whether to resort to deadly force. *Harre*, 155 Ill. 2d at 395; *Condon*, 148 Ill. 2d at 109-10.

¶ 25    To this end, the statute prohibits a felon from being armed at any point that creates an "immediate potential for violence." *People v. Anderson*, 364 Ill. App. 3d 528, 538-39 (2006). That potential may be present because the felon is armed during, or while en route to, the underlying felony—for example, when a drug dealer brings a gun to a transaction. See, *e.g.*, *Harre*, 155 Ill. 2d at 401 (defendant had access to gun while en route to drug sale); *People v. Curry*, 2018 IL App (1st) 152616, ¶¶ 18, 22 (defendant had gun during drug sale). Or it may be present because the felon is armed when confronted by the police during the course of, or while fleeing from, the underlying felony. See, *e.g.*, *Anderson*, 364 Ill. App. 3d at 529-30, 537 (defendant armed when police approached him).

¶ 26    And sometimes—as in this case—the police confront the felon while executing a search warrant for a home where the defendant is present. In these circumstances, our supreme court has held, the felon commits armed violence if (among other things) he was armed "'when the police entered'" the home to execute the warrant. *People v. Smith*, 191 Ill. 2d 408, 412 (2000) (quoting *Condon*, 148 Ill. 2d at 110).

¶ 27    In *Smith*, the defendant saw the officers approaching his apartment building and dropped his gun out a window. *Id.* at 410. Inside Smith's apartment, the police found cocaine but no

weapons. *Id.* These undisputed facts established that Smith was armed, at least for a time, while he (constructively) possessed cocaine in his apartment, and as the police approached the building. Yet the supreme court reversed his conviction for armed violence. *Id.* at 413.

¶ 28    There are two points to glean from *Smith*'s holding. First, even though Smith was armed while he was committing a narcotics offense—a predicate for armed violence—the statute did not apply to his conduct. Merely being armed while possessing drugs, alone in one's home, does not create any potential for a violent confrontation, and thus it is not the kind of conduct that the statute was enacted to deter. *Id.*; see also *Condon*, 148 Ill. 2d at 110 (it "reaches too far" to impose armed-violence liability whenever someone has both guns and drugs at home).

¶ 29    Second, Smith did not commit armed violence even though he was armed as the police approached his home. The dissent in *Smith* argued that the potential for a violent confrontation was already present at that time. *Smith*, 191 Ill. 2d at 418 (Miller, J., concurring in part and dissenting in part). Someone in Smith's position near the window could have fired at the officers; and the officers, upon seeing Smith in the window with a gun, could have fired preemptively. (It does not matter that Smith's gun was unloaded. See *id.* at 410. The armed-violence statute does not require a defendant to possess a *loaded* weapon. See 720 ILCS 5/33A-1(c)(1)-(2) (West 2016); *id.* § 5/33A-1(a); *Anderson*, 364 Ill. App. 3d at 542. An unloaded gun, displayed in the wrong circumstances, can just as easily provoke a violent response as a loaded one. *Anderson*, 364 Ill. App. 3d at 542.)

¶ 30    But the *Smith* majority necessarily rejected this argument when it held, as a matter of law, that the statute required Smith to be armed " 'when the police entered' " his apartment. *Smith*, 191 Ill. 2d at 412 (quoting *Condon*, 148 Ill. 2d at 110). The majority thus drew the line at a familiar threshold: the front door of the home. Until the police cross that threshold, the subject of

the search can still distance himself from any weapons inside and thus defuse any risk that the impending search will escalate into a shootout. Imposing liability against a defendant who no longer has his weapon at hand when the police enter the home would "frustrate," rather than serve, the statute's purpose of "deterring criminals from involving themselves and others in potentially deadly situations." *Id.* at 412-13.

¶ 31    At oral argument, the State agreed that *Smith* is the controlling precedent, and thus that the question presented in this case is whether defendant was armed—specifically, with the gun found on the living room couch—when the police entered the second-floor apartment.

¶ 32                              B. "Otherwise Armed"

¶ 33    The question thus presented is a factual question. And a disputed factual question at that: Defendant contends that he was not armed with the gun when the police entered the apartment; the State counters that he was. So defendant's guilt is not, as he says in his brief, a pure question of law, and our review (unlike in *Smith*, 191 Ill. 2d at 411-12, where the sufficiency challenge turned on a question of statutory interpretation) is not *de novo*. See *People v. Loggins*, 2019 IL App (1st) 160482, ¶¶ 30-32 (when parties dispute on appeal whether defendant was armed at certain time, review is under *Jackson* standard). Rather, we ask whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found this element of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Ross*, 229 Ill. 2d 255, 272 (2008).

¶ 34    For purposes of the armed-violence statute, a person is "armed with a dangerous weapon" when he "carries on or about his or her person or is otherwise armed with" a firearm or other qualifying weapon. 720 ILCS 5/33A-1(c)(1)-(2) (West 2008). Because the statute applies to a person who is "*otherwise* armed"—that is, someone who is not carrying a weapon—it does not

require actual or physical possession of a weapon. (Emphasis in original.) *Harre*, 155 Ill. 2d at 401.

¶ 35    The statute does, however, require more than mere constructive possession. *Condon*, 148 Ill. 2d at 110-12. In *Condon*, the police confronted the defendant in his kitchen after entering on a warrant; during the search, they found guns in several rooms of the house, including various bedrooms and an office, but none in the kitchen. *Id.* at 110. The supreme court held that Condon was not "otherwise armed" with those guns, even though he clearly had constructive possession of them, because "they were too far removed" for him to "use the guns" against the officers. *Id.*

¶ 36    So we can put aside the State's arguments that defendant had constructive possession of the gun on the couch. Even if, as the State says, defendant knew the gun was there and exercised control over that "area," these inferences do not establish that he was "otherwise armed." The State's principal case, *People v. Anderson*, 2018 IL App (4th) 160037, does not hold otherwise. The constructive-possession analysis in *Anderson* pertained to the defendant's conviction for unlawful use of a weapon by a felon, and not—as the State claims—his conviction for armed violence. *Id.* ¶¶ 32-33.

¶ 37    Rather, defendant was "otherwise armed" only if he had "immediate access to or timely control over" the gun itself. *Harre*, 155 Ill. 2d at 396; *Condon*, 148 Ill. 2d at 110. The State thus had to prove that it would have been possible for defendant to "use" the gun, if had he chosen to, when the officers entered the apartment. See *Condon*, 148 Ill. 2d at 110.

¶ 38    Aside from constructive possession, the State's theory on appeal is that defendant was "otherwise armed" because he had "ready access" to the gun "in the presence of the officers who just breached the front door." The gun, or so the State claims, was within arm's reach: Defendant

could "have reached out, grabbed the gun, and fired against the officers" "at any time" after the breach, given his "extremely close proximity to" the gun.

¶ 39   As soon as the police entered, they saw the gun on the living room couch. And where was defendant? Neither Johnson nor Gade saw him. Bokowski testified that defendant was not in the living room; he was either "inside" or "approaching" the dining room, and "fleeing towards the back of the apartment." Dougherty testified that defendant was "running through the apartment," specifically "the dining room area." Walsh testified that defendant was "fleeing from the living room into the kitchen area."

¶ 40   The officers' testimony made two things perfectly clear. First, by all accounts, defendant was running toward the back of the apartment—the rear exit, as it turned out. And the couch was in the very front of the apartment: As Bokowski testified, it was "immediately in the residence a little to the right" of the front door. So it is not possible, as the State asserts, that defendant was moving *toward* his gun while the officers were inside the apartment. The officers testified that he was moving *away* from it.

¶ 41   At oral argument, the State emphasized that defendant could have been coming from the front bedroom, which was adjacent to the living room, when the officers breached the door and saw him running through the apartment. And in that case, the State argued, defendant would have been moving toward the couch—at least for a time—while en route to the rear exit.

¶ 42   We cannot know where defendant was when the police came knocking on the door. And neither could the officers. Defendant could have been in the front bedroom, as the State argues on appeal. Or he could have been on the couch, as the State argued at trial. (More on this later.) But ultimately, it doesn't matter. Even if defendant had to run toward the couch, at some point, to cut a path to the rear exit, he was not running toward the couch while the officers were inside

the apartment. If that happened at all, it happened *before* the officers breached the door—in which case, it is not relevant under *Smith*.

¶ 43    As we have noted, the officers were clear that defendant was already running toward the back of the apartment when they first entered. None of the officers testified that defendant, at any point, appeared to be going for his gun. (Recall that Johnson immediately secured the gun upon entering the apartment.) And none of the officers testified that defendant was running toward them. To the contrary, when the officers entered and first saw defendant running, one of them shouted, simply, "he's running, he's running," and the others gave chase—pursuing defendant out the back door and into the first-floor apartment. The only reasonable interpretation of this testimony is that defendant was running *away* from the officers' position just inside the front door, and thus in the immediate vicinity of the gun on the couch. The State's hypothesis on appeal—that defendant was advancing toward his gun in the presence of the officers—cannot be reconciled with the officers' actual testimony.

¶ 44    Second, the gun on the couch was not within defendant's immediate reach. Viewing the evidence in the light most favorable to the State, defendant was—at best—at the far edge of the living room, in or around the threshold between the living and dining rooms. Bokowski testified that was about 15 feet from the couch.

¶ 45    At oral argument, the State insisted that the trial evidence did not establish the distance between defendant and the gun when the police entered the apartment. (If that were true, it would hardly be a reason to affirm defendant's conviction, as it was the State's burden to prove that the gun was immediately accessible to him.) The crux of the State's position is this: Bokowski testified that defendant was approximately 15 feet from *him* when he entered the apartment, not 15 feet from *the gun*. But as we noted above, Bokowski testified that the couch was right next to

the front door—it was "immediately in the residence a little to the right" of the door. So when Bokowski first entered the apartment and saw defendant running, he was, necessarily, standing near the couch. Of course, the gun could have been a foot or two closer, or farther, from defendant than Bokowski was, depending on exactly where it was on the couch. But Bokowski's estimate of the distance between defendant and his own position is a reasonable proxy for the distance between defendant and the gun. The record thus establishes that defendant was approximately 15 feet from the gun when the first officer, Bokowski, entered the apartment. From that distance, defendant could not, as the State contends, simply reach out his arm, grab the gun, and fire at the officers.

¶ 46     The State does not cite, and we are not aware of, any case that affirmed a conviction for armed violence when the defendant was this far removed from his gun. In *Loggins*, 2019 IL App (1st) 160482, ¶ 35, for example, the defendant's gun was either on his chair, or on the chair next to him, about one foot away, when the police entered his dining room to execute a search warrant. In *People v. Bond*, 178 Ill. App. 3d 1020, 1023 (1989), the gun was underneath the sofa cushion the defendant was sitting on while the police searched his house. In *People v. Hernandez*, 229 Ill. App. 3d 546, 550 (1992), the gun was under the mattress, near the edge of the bed and within the defendant's reach, when the police entered his bedroom. And in *People v. Scott*, 2011 IL App (2d) 100990, ¶ 30, the defendant's gun was "perhaps a foot or two away" from him. In each of these cases, the defendant was "otherwise armed" with a nearby weapon because it was within his immediate reach. Not so here.

¶ 47     Defendant argues that to be immediately accessible, the gun *had to be* within arm's reach when the police entered the apartment. If it is beyond arm's reach, defendant argues, he could not have made a "spontaneous decision" to use it against the officers. See *Harre*, 155 Ill. 2d at

395; *Condon*, 148 Ill. 2d at 109-10. We would not go that far. There is no reason why a defendant could not make a spontaneous decision to lunge for, and ultimately use, a weapon that is just beyond arm's reach—say, an extra step or two away—provided that the defendant, under the circumstances, could have accessed the gun if he had tried to. (True, defendant did not try to access the gun, but "it is the possibility of violence, and not the defendant's actual intent to commit or threaten violence, that is crucial" to the question of his guilt. *Scott*, 2011 IL App (2d) 100990, ¶ 20.)

¶ 48    But here, it is not reasonable to infer that defendant could have accessed the gun when the police entered the apartment. Not by reaching out his arm, and not with a little more effort, either. The couch, as we have noted, was right next to the front door. Gade testified that no fewer than eight officers came through that door. And Johnson "immediately" secured the gun on the couch. Meanwhile, by the time Bokowski was through the door, defendant was already on the far edge of the room, 15 feet away, and running further in the opposite direction. Even if defendant had tried to access the gun, there is no realistic chance that he could have done so, in light of his (increasing) distance from the gun and the sheer number of officers standing directly in his way.

¶ 49    Since defendant could not have "use[d]" the gun when the officers entered the apartment, he was not "otherwise armed" at that time. See *Condon*, 148 Ill. 2d at 110.

¶ 50    The State's attempt to distinguish *Condon*, one of defendant's cited cases, is not convincing. True, in *Condon*, the defendant's guns were scattered throughout other rooms (and floors) of his house; here, defendant was in the threshold of the room where his gun was found. *Id.* Perhaps this shows that the issue in this case is somewhat closer than it was in *Condon*. But the bottom line is the same: There is no realistic chance that defendant could have accessed the gun—not from 15 feet away, not while he was running in the opposite direction, and not when

eight officers stood between him and the gun. Like Condon, defendant may have had constructive possession of the gun on the couch, but he was not "otherwise armed" with it.

¶ 51    Our decision in *Curry*, 2018 IL App (1st) 152616, does not support the State's position. In *Curry*, "the defendant [did] not dispute that he possessed a gun while selling drugs." *Id.* ¶ 22. Being armed at *that* time surely created an immediate potential for violence. See *Harre*, 155 Ill. 2d at 400 (defendant had immediate access to gun while en route to drug sale). And Curry was armed when the police first confronted him; that was clear from the officers' testimony that Curry threw his gun away mid-flight, while they were chasing him in the stairwell of a building after he fled the scene of the drug sale. *Curry*, 2018 IL App (1st) 152616, ¶ 4. That interval of time before Curry tossed the gun also created an immediate potential for violence. See *Anderson*, 364 Ill. App. 3d at 529-30, 537 (defendant armed when police first approached him in building courtyard). Curry's conviction could have been affirmed on either of these two grounds. *Curry*, 2018 IL App (1st) 152616, ¶ 18. But neither ground is available in this case.

¶ 52    As the State notes, Curry argued that he was no longer armed when the police eventually *arrested* him. But his argument was beside the point; the armed-violence statute does not require a defendant to be armed when he is arrested. *Id.*; *Harre*, 155 Ill. 2d at 401. If the defendant was armed when the police first confronted him, he cannot escape liability for armed violence by disposing of his weapon in flight, before the police apprehend him. *Loggins*, 2019 IL App (1st) 160482, ¶¶ 40-42 (conviction affirmed, as defendant distanced himself from gun *after* police entered house and was unarmed when later arrested after running outside).

¶ 53    The State attributes the same failed argument to defendant. But defendant never argues that his conviction should be reversed because he was unarmed when he was arrested in the first-floor apartment. Unlike Curry, defendant argues that he was not armed when the police first

confronted him—that is, when they entered the second-floor apartment. For the reasons we have given, the evidence, even viewed in the light most favorable to the State, compels that inference.

¶ 54                                C. Findings of Fact

¶ 55    In reversing defendant's conviction for armed violence, we are simply enforcing the line that our supreme court drew in *Smith*, 191 Ill. 2d at 412. We are not relying on any "credibility findings" of our own making, or "wholly disregard[ing] all of the findings of fact made by the jury," as the State alleges a reversal would necessarily require us to do. In fact, we are skeptical that the jury actually found that defendant was armed when the police entered the apartment. That is not a finding the State asked the jury to make—at least not in its closing argument.

¶ 56    In its opening statement, the State told the jury that "[w]hen they entered that residence, officers saw the defendant *sitting on the couch* in his underwear *with a gun right next to him* on that couch." (Emphases added.) But that assertion utterly failed to hold up at trial. So the State scotched its initial theory of the case and fashioned a new one in closing argument.

¶ 57    The State argued, in sum, that defendant was relaxing in the second-floor apartment when he heard a noise. It was the police breaking down the front door of the building, but defendant did not know that. For all he knew, it was an intruder. So he "grabs his gun" and "goes to the living room." When he realized the police were coming for him, he decided to flee. And he knew that "it's not in his best interests to try and take this gun with him when he runs from the police." So he took his cannabis and "left" the gun "on the couch"—where the officers found it, as soon as they came through the front door.

¶ 58    Thus, the State's theory, in a nutshell, was this: Defendant was armed with the gun *right before* the police entered the apartment. We need not decide whether a rational jury could have made that finding beyond a reasonable doubt. The factual merit of the State's theory is not the

point. What matters is that the State's closing argument was a variant of the theory offered by the dissent, but rejected by the majority, in *Smith*. The difference is that (under the State's hypothesis) defendant did not separate from his gun until the last minute—when the police were on the brink of entering his apartment, as opposed to approaching the outer door of the building. But just in time is soon enough. The State's own evidence showed that defendant separated from his gun before the officers crossed the threshold identified in *Smith*: the front door of the home.

¶ 59     On appeal, the State does not defend the theory it argued to the jury. And rightfully so. That theory is not legally viable. The State had to prove that defendant was armed when—not shortly or even immediately before—the officers entered the apartment. No rational juror could have made *that* finding beyond a reasonable doubt. Indeed, defendant's jury was never even asked to.

¶ 60     In sum, the State failed to prove that defendant was armed when the police entered the second-floor apartment. We reverse defendant's conviction and sentence for armed violence.

¶ 61                          II. Ineffective Assistance of Counsel

¶ 62     Having reversed defendant's conviction for armed violence, we need only reach two of the remaining issues that he raises. Both are claims of ineffective assistance of counsel. We take them in turn.

¶ 63                          A. Failure to Move for Discovery Sanctions

¶ 64     Almost four years into the pre-trial proceedings, the police destroyed much of the evidence that was seized during the search. Sergeant Kappel of the Evidence and Recovered Property Section testified that the narcotics vault got wet, and the cannabis started to rot. To avoid any potential health risk, Kappel had the cannabis destroyed. A couple months later, the digital scale and keys to the second-floor apartment were discarded. Kappel did not know why,

but he assumed that someone in the evidence section noticed that the cannabis had been destroyed, figured the case was over, and discarded the keys and scale "without checking further." When the State informed the defense that this evidence had been destroyed, counsel did not move for discovery sanctions.

¶ 65 At trial, the State offered testimony about the destroyed items from the officers who recovered them, photos of those items taken at the scene, and testimony from the chemist who verified that the substance packaged in the small plastic bags was cannabis.

¶ 66 Defendant contends that his trial attorney was ineffective, in the first instance, for failing to file a motion for discovery. Due to that initial (and undisputed) failure, defendant could not move for discovery sanctions when the police destroyed the cannabis, scale, and keys.

¶ 67 Illinois Supreme Court Rule 412 requires the State, "upon written motion of defense counsel," to disclose any "tangible objects which the prosecuting attorney intends to use in the hearing or trial or which were obtained from or belong to the accused." Ill. S. Ct. R. 412(a)(v) (eff. Mar. 1, 2001). A specific request for an item of evidence, pursuant to Rule 412, puts the State on notice that the item must be preserved. *People v. Koutsakis*, 255 Ill. App. 3d 306, 311 (1993).

¶ 68 If the State fails to comply with its discovery obligations under Rule 412, the trial court may impose any sanctions it deems "just under the circumstances" to eliminate any unfair prejudice to the defendant. Ill. S. Ct. R. 415(g)(i) (eff. Oct. 1, 1971). Sanctions may be imposed, under Rule 415, without any showing that the State acted in bad faith when it destroyed the evidence. *People v. Newberry*, 166 Ill. 2d 310, 317-18 (1995); *People v. Cunningham*, 2018 IL App (1st) 153367, ¶¶ 50, 54; see *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004) (to claim

violation of due process, defendant must show bad faith, unless State destroyed material exculpatory evidence).

¶ 69      There is no valid strategic reason for a defense attorney *not* to file a discovery motion. That is the mechanism by which the defense acquires most of the material it needs to prepare for trial (or, for that matter, to make an informed decision about how to plead). Due process requires automatic disclosure of material exculpatory evidence, and nothing more. *United States v. Agurs*, 427 U.S. 97, 111-12 (1976). But an effective defense attorney surely needs to examine the case *against* the defendant, too; and for that, a discovery motion is necessary. Ill. S. Ct. R. 412(a) (eff Mar. 1, 2001).

¶ 70      At least in principle. In practice, as apparently happened here, the State might tender discovery to the defense, anyway, as a matter of routine, even when the defense has not filed a discovery motion. But that does not excuse defense counsel from filing one. If no "written motion of defense counsel" has been filed, the State will not be in breach of its disclosure obligations if evidence (other than material exculpatory evidence) is destroyed; and thus, as defendant says, the defense will have no basis for requesting discovery sanctions in the event that happens. So failing to file a routine discovery motion is not a reasonable strategic decision. It is deficient performance. *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (counsel's failure to request discovery, based on mistaken belief that prosecution was obliged to turn over inculpatory evidence without request, served no strategic purpose and was deficient); see *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984).

¶ 71      The real question is whether counsel's failure was prejudicial. Defendant must show a reasonable probability that the outcome would have been different, if not for counsel's deficient representation. *Id.* at 694. Spelled out, the required showing is as follows: If counsel had filed a

discovery motion, so that the defense could have moved, and did move, for sanctions when the evidence was destroyed, then there is a reasonable probability that sanctions would have been imposed, and that those sanctions would have resulted in a favorable outcome for defendant on one or more of the charges.

¶ 72    Sanctions can result in a favorable outcome for a defendant in one of two ways. In the extreme case, the trial court can dismiss the indictment before trial. See *Newberry*, 166 Ill. 2d at 318 (indictment dismissed as sanction for destruction of narcotics evidence). Or the trial court can impose lesser sanctions that limit the State's ability to offer testimony or other evidence at trial regarding the items that were destroyed. See *People v. Kladis*, 2011 IL 110920, ¶¶ 44-46 (officer barred from testifying about contents of dash-cam video destroyed after defense requested it).

¶ 73    First up, the cannabis. Defendant bases his argument principally on *Newberry*, 166 Ill. 2d 310. Newberry was initially indicted for possession of a cocaine look-alike, after a field test of the substance in question was negative for cocaine. *Id.* at 311-12. A lab test later indicated that it *was* cocaine; the look-alike charges were then dropped, and Newberry was re-indicted on various charges of possession of an actual controlled substance. *Id.* at 312. Newberry's attorney filed a discovery motion, which included a "request to examine all tangible objects that had been seized from Newberry." *Id.* After the State disclosed that a lab technician had destroyed the substance, on the mistaken assumption that the dismissal of the look-alike charges signaled the end of the case, the trial court granted Newberry's motion to dismiss the indictment. *Id.* at 313. The Illinois Supreme Court affirmed that relief, both on due-process grounds and under Rule 415. *Id.* at 317-18. The United States Supreme Court rejected *Newberry*'s due-process analysis in *Fisher*, 540

U.S. at 546-49, but the state-law ground of decision, as Justice Stevens noted in his concurrence, remains good law. *Id.* at 550 (Stevens, J., concurring in the judgment).

¶ 74   The dismissal of the indictment in *Newberry*, 166 Ill. 2d at 318, was warranted because of the "pivotal nature of the evidence" that was destroyed. The identity of the substance seized from Newberry was at issue. Because there was conflicting evidence as to what that substance actually was, there was some question as to whether the State could prove the revised charges beyond a reasonable doubt, and Newberry had at least some "realistic hope of exonerating himself" by having the substance tested by his own experts. *Id.* at 315.

¶ 75   That opportunity was permanently lost when the substance was destroyed. Newberry had no opportunity to dispute the lab results with evidence "of equal integrity and persuasiveness," that is, with lab tests conducted by his own experts. (Internal quotation marks omitted.) *Id.* at 316. It would have been unfair to force Newberry to stand trial when his ability to pursue a potentially meritorious defense, based on a contested issue, had been thwarted by the State's destruction of evidence. *Id.* at 316-17.

¶ 76   There were no conflicting test results in this case. The forensic chemist reached the same result using both chemical and microscopic analyses: The substance in the small plastic bags was cannabis. And as far as the record shows, defendant never claimed otherwise in the nearly four years that passed between his arraignment and the destruction of the cannabis. He has given us no reason to think that challenging the identity of that substance was ever supposed to be part of his defense. Rather, his defense—as he testified—was that the officers yanked him out of the first-floor apartment and planted the cannabis on him when they didn't find anyone upstairs to arrest. Given that theory of defense, there was no reason why defendant's attorney would have needed access to the cannabis either before or at trial.

¶ 77    Thus, the cannabis was not like the dash-cam video destroyed in *Koutsakis*, 255 Ill. App. 3d at 310-11, which was necessary for Koutsakis to contest both the officer's account, and the objective reasonableness, of the traffic stop that was put at issue by his motion to suppress. And, unlike in *Newberry*, 166 Ill. 2d at 315-17, there is no reason to think that the defense had anything to gain from re-testing the substance. Defendant's argument is speculation.

¶ 78    The same is true with respect to the digital scale and the keys to the second-floor apartment. Defendant has not identified anything that was contested about these items, other than whether they were his. Defendant's contention has always been that he had nothing to do with these items, that he did not live in the second-floor apartment, that he was not even present there, and that the police put this entire case on him. Defendant has not explained why he needed access to the scale or keys, either before or during trial, to fully conduct his defense.

¶ 79    Instead, defendant focuses on how the destroyed items were relevant to the State's case. For example, he says, without any evidence that the police found a digital scale in the second-floor apartment, the State would have had less evidence that he intended to distribute the cannabis. (There was still the fact that the cannabis was parceled into 58 small plastic bags.) But that just restates the point that the destroyed evidence was inculpatory; it does not show how the defense was hindered by its loss.

¶ 80    The point of discovery sanctions is not, in defendant's telling phrase, to "punish[ ] the State" for the bare fact that evidence was destroyed or otherwise lost. Discovery sanctions are meant to remedy any prejudice to the defense caused by the absence of the evidence. Because defendant has not shown how the loss of the cannabis, scale, or keys hindered his defense, he has not shown that he was prejudiced by counsel's failure to file a routine discovery motion and later, a motion for sanctions.

¶ 81                    B. Implication of "Several" Prior Convictions

¶ 82    Defendant also contends that his attorney was ineffective for implying to the jury that he had been convicted of "several" prior felonies, when the State "only moved to introduce one."

¶ 83    The State moved *in limine* to introduce one of defendant's prior convictions, a 2009 drug case from Indiana, for impeachment purposes. See *People v. Montgomery*, 47 Ill. 2d 510 (1971). When defendant took the stand, defense counsel fronted his criminal history by asking, "[Y]ou have several felony convictions. Is that correct?" Defendant answered, "Not several, I have a couple." The State followed up on cross-examination, asking defendant to confirm that he "had a few felony convictions," and that "one of those is from a 2009 case for dealing cocaine out of Indiana." Defendant answered "yes" to both questions.

¶ 84    On appeal, defendant contends that counsel's "inept questioning" was "the only reason" the jury learned that he had "several" prior convictions. True, the State moved to introduce only one prior conviction for impeachment purposes. But the parties stipulated that defendant had two (other) prior felony convictions that qualified as predicates for the charge of armed habitual criminal. Thus, the jury was bound to hear about three prior convictions if defendant took the stand, which he did.

¶ 85    Granted, there was no particularly good reason for defendant's own attorney to highlight the two qualifying convictions in this context, when those convictions had not been admitted for impeachment purposes. But counsel did not mislead the jury, inflate defendant's actual criminal history, or disclose any prior convictions that were not disclosed anyway. Counsel's chosen word—"several"—means "more than two but fewer than many." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/several (last visited May 14, 2019) [https://perma.cc/5VLQ-CWV5]. And that accurately describes the number of prior convictions

that were in evidence, for one purpose or another. Counsel's questioning was clumsy, but it was not constitutionally deficient, much less prejudicial.

¶ 86     Because counsel was not ineffective, defendant is not entitled to a new trial. We thus affirm his remaining convictions for armed habitual criminal and possession of cannabis with intent to deliver.

¶ 87                                        CONCLUSION

¶ 88     We reverse defendant's conviction and sentence for armed violence. We affirm his convictions and sentences for armed habitual criminal and possession of cannabis with intent to deliver.

¶ 89     Affirmed in part and reversed in part.