2021 IL App (1st) 190813-U

No. 1-19-0813

November 2, 2021

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 12188 |
| | ) | |
| ANDRE DAVIS, | ) | Honorable |
| | ) | James M. Obbish, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*:  Defendant's convictions for aggravated kidnapping and concealment of homicidal death are affirmed where the evidence was sufficient to establish the victim was alive when defendant confined him, defendant was armed with a dangerous weapon during the kidnapping, and defendant knew the victim was dead when defendant acted to conceal the homicide.

¶ 2    Following a bench trial, defendant Andre Davis was found guilty of aggravated kidnapping

(720 ILCS 5/10-2) (West 2012)) and concealment of homicidal death (720 ILCS 5/9-3.4 (West

2012)), and sentenced to consecutive 12-year and 3-year prison terms, respectively. He appeals,

arguing that the evidence was insufficient to establish that he (1) kidnapped the victim while the victim was alive, (2) was armed with a dangerous weapon during the offense, or (3) concealed the victim's body knowing the victim was deceased. We affirm.

¶ 3    Defendant was charged by indictment with 17 counts, including for first degree murder, aggravated kidnapping, and concealment of homicidal death, following an incident on October 5, 2013, involving the victim Jamal Harmon. As to the aggravated kidnapping, the indictment alleged, in relevant part, that defendant used "a dangerous weapon *** to wit: a knife." Defendant's bench trial occurred separately but simultaneously to co-offender Derrick Hilliard's jury trial.[1]

¶ 4    At trial, Carl Allen testified that he was currently serving a sentence for robbery in Iowa. In October 2013, Allen was 16 years old and lived in Chicago. On the night of October 5, 2013, Allen and his friend Tyrone Graham attended a party hosted by Hilliard, whom Allen identified in court, at a house on Ross Avenue in Chicago. At some point, Hilliard asked Allen and Graham to sit on the front porch and work as "security" for the party, and handed them firearms.

¶ 5    The prosecutor showed Allen People's Exhibit No. 1, a photograph of a man Allen identified as "JJ," later determined to be Harmon. Allen was on the porch when Harmon arrived and went upstairs to play dice. During the party, Hilliard's girlfriend approached Allen and told him to watch Harmon. Harmon overheard the comment and argued with Allen about it. A man Allen knew as "Big Jeff" intervened and escorted Harmon outside, where he continued to argue. Hilliard and Graham followed outside, where Allen, Big Jeff, Harmon, and others were gathered. Big Jeff told Harmon to go home, but he refused. Hilliard stated that Harmon "f*** up" the party,

_____

[1] Derrick Hilliard is not a party to this appeal.

took a firearm from Graham, walked behind Harmon, fired twice, and discarded the firearm. Harmon fell to the ground face-up and said, "Go get my guys." Hilliard's brother Juan retrieved the firearm and shot Harmon again. Allen went back inside and instructed the guests to leave, and guests started running from the house.

¶ 6     Hilliard's girlfriend gave Allen keys to a black vehicle parked behind the house and told him to leave. Allen then saw Graham and defendant, whom Allen knew as Hilliard's "uncle," place Harmon in the trunk of a silver vehicle, which defendant and Hilliard drove away from the party. While defendant and Graham moved Harmon, Harmon made noises that Allen described as "snoring." Allen, Graham, and two others drove away in the black vehicle.

¶ 7     Before defendant drove the silver vehicle away, he pulled alongside Allen's vehicle and said he would "get rid of the body" at the lake. The next day, Allen learned from Hilliard that Harmon's body had not been dropped at the lake. During a later conversation between Allen, Hilliard, and defendant, Hilliard asked defendant why he did not take Harmon's body to the lake. Defendant responded, "I don't need no gun to kill nobody. I cut throats." Allen asked defendant what he meant, and he responded that he "stabbed" Harmon.

¶ 8     On April 29, 2014, Allen spoke with police officers regarding the incident. Allen identified Hilliard that day in a photo array, and returned on June 11, 2014, and identified defendant in a physical lineup.

¶ 9     On cross-examination, Allen testified that he drank tequila and smoked marijuana prior to the shooting. Hilliard shot Harmon in the back and the neck, then Juan shot Harmon twice in the face. Allen initially testified that he could not see how Graham and defendant picked up Harmon, but later stated that Graham held Harmon's legs during the transfer. Allen also acknowledged

telling detectives he was already in the black vehicle while Graham and defendant carried Harmon's body to the trunk of the silver vehicle, and that he testified before the grand jury that Graham grabbed Harmon's head and defendant grabbed his arms during the transfer.

¶ 10     Jeff Hasberry testified that he attended the party on October 5, 2013. At some point, there was "commotion" during the dice game. Hilliard asked Harmon to leave, but he refused. Eventually, Harmon and others went outside. Hilliard followed, and Hasberry witnessed Hilliard shoot Harmon. Hasberry ran inside, gathered his friends, and left the party. He heard more gunshots as he left. Hasberry spoke to officers at the police station on three separate occasions, and also testified before the grand jury.

¶ 11     Chicago police officer Ronald Pittman testified that on October 6, 2013, at approximately 7:30 a.m., he responded to a call of a "person down" near 76th Street and Morgan Street in Chicago. A bystander directed him to an alley, where he found Harmon's body. His throat was "slashed."

¶ 12     Sergeant Charles Maida testified that he also responded to the alley, where a forensic investigator recovered nail scrapings and took a blood swab from Harmon's body. Maida and the investigator then traveled to a house on the 6500 block of South Ross Avenue, where they recovered a fired bullet and additional blood swabs.

¶ 13     Chicago police officer Elizabeth Dawson testified that she preserved blood samples for DNA testing in connection with defendant's case, and collected a fired bullet and Harmon's clothing following the autopsy. She also photographed and recovered evidence from an impounded Cadillac in connection with the case in June 2014, including from a trunk lining rug. The State

entered the photographs into evidence, including People's Exhibit No. 84, which showed the Cadillac's license plate number was S188142.

¶ 14    The State entered a certified vehicle record showing that defendant owned a 2001 Cadillac with license plate number S188142.

¶ 15    Chicago police detective Steven Spremo testified that he initially reported to the alley, then followed a lead to the house on Ross Avenue. There, Spremo observed "a pool of blood in the grass and a fired bullet on the sidewalk." Spremo and his partner questioned Allen during the investigation, and Allen identified Hilliard and Juan as the shooters. Based on Allen's information, Spremo went to defendant's home. Spremo also investigated a silver Cadillac owned by defendant. Defendant was later arrested, and Allen returned to the police station and identified him in a lineup as the man who carried Harmon's body to the vehicle, and also identified photographs of defendant's vehicle. Hasberry also viewed a lineup including defendant, but did not identify anyone.

¶ 16    Chicago police officer Zbigniew Niewdach testified that he recovered blood samples from the interior of a 1994 Chevrolet in connection with this matter. On cross-examination, he stated he did not find any blood in the trunk.

¶ 17    Rebecca McInerney, a forensic scientist for the Illinois State Police, testified that she preserved fingernail scrapings and blood swabs in connection with defendant's case. She received three swabs from a vehicle, which did not indicate the presence of blood. She also preserved a buccal swab standard for defendant and blood recovered from a trunk liner of a vehicle.

¶ 18    Angela Kaeshamer, a forensic scientist for the Illinois State Police, testified that she received swabs from Harmon's fingernails, a blood standard for Harmon, buccal standards for

defendant and Hilliard, and blood swabs from a front lawn, sidewalk pavement, and a vehicle's trunk liner. Kaeshamer recovered DNA profiles from defendant and Hilliard's standards. Kaeshamer also identified a "mixture of human DNA profiles" from the scrapings from Harmon's left-hand fingernails, and found a major male DNA profile that matched Harmon, but not defendant or Hilliard. Similarly, the blood samples from the lawn and sidewalk matched Harmon, but not defendant or Hilliard. The blood sample from the trunk liner also matched Harmon, and the profile would have been expected to occur in "approximately one in 3.8 quintillion black, one in 46 quintillion white, or one in 880 quintillion Hispanic unrelated individuals."

¶ 19 Dr. Adrienne Segovia, an assistant medical examiner for Cook County, testified that she performed Harmon's autopsy. Harmon's injuries included gunshot wounds to his right cheek, left shoulder, and chest. The bullet that struck Harmon's right cheek entered the base of his skull, moved towards the left, tore his spinal cord, then "exited below the base of the skull" and "into the scalp." Harmon also suffered six "incised" wounds caused "by something sharp" on his neck and chin, as well as stab wounds to his chest. Harmon's right lung contained aspirated blood, which Segovia linked with the "incised wound to the neck." The gunshot wounds and incised wounds were all potentially fatal, but the incised wounds to the "[carotid] and jugular, the thyroid cartilage and the esophagus," along with the gunshot to the cheek, were "the more immediately life-threatening injuries."

¶ 20 In Dr. Segovia's opinion, Harmon "was alive when he received the incised wounds to the neck and chin." She based this opinion on the aspirated blood and hemorrhages in Harmon's neck muscles, which indicated "his heart was beating" when he incurred the incised wounds. The gunshot wound to Harmon's face was not the source of the aspirated blood. In her opinion,

Harmon's manner of death was homicide caused by "multiple stab and incised wounds and the multiple gunshot wounds." The State entered into evidence a series of photographs depicting the incised and stab wounds, identified by Segovia, which are included in the record on appeal.

¶ 21    On cross-examination, Dr. Segovia agreed that when she performed the autopsy, she did not know that the incised wounds occurred after the gunshot wounds, and her first impression was that the wounds all occurred around the same time. She agreed that the gunshot wounds to Harmon's shoulder and chest were "not immediately life threatening," and a person with those injuries likely could breathe and speak. Harmon could have survived for "minutes" after sustaining the gunshot wounds, but she could not rule out that Harmon died within five minutes. Some amount of blood could be inhaled in a person's final breaths after sustaining a gunshot wound to the face. She reviewed the opinions of defendant's experts. Those opinions did not alter her conclusions, and she disagreed with defendant's experts that Harmon's lack of "organ pallor" indicated the stab and incised wounds occurred postmortem.

¶ 22    On redirect, Dr. Segovia testified that she would have expected to find blood in Harmon's mouth if the source of the aspirated blood were the gunshot wound to his face, but she found none. Harmon's neck muscle hemorrhage indicated that he was alive when he sustained the wounds to the neck.[2]

¶ 23    Defendant called Deon Crosby, who testified that he attended the party on October 5, 2013. At some point, he heard Harmon outside "screaming," as though arguing with someone. Moments later, Crosby heard gunshots. He walked outside and saw Harmon on the ground "like he was

---

[2] In its case-in-chief, the State also entered a stipulation as to testimony from Aimee Stevens and Cynthia Prus. The content of these stipulations is not apparent from the report of proceedings, and copies of the stipulations are not in the record on appeal.

shot." Crosby overheard Hilliard say, "I don't know what you all are tripping for, he's dead now." Crosby spoke with police officers the next day, and relayed Hilliard's statement.

¶ 24    Dr. Daniel Spitz, chief medical examiner for Macomb County and St. Clair County in Michigan, testified as an expert in forensic pathology. In his opinion, Harmon sustained the incised wounds postmortem. The gunshot that entered Harmon's right cheek implicated his brain stem, and was a "rapidly fatal wound" that would have caused death in "a period of seconds to maybe a few minutes." After one or two minutes, Harmon would have been unable to breathe loudly or speak. Additionally, Dr. Spitz noted a lack of active hemorrhage around the incised wounds, which suggested they occurred postmortem. He would have expected significant additional bleeding from certain incised wounds had Harmon been alive when he sustained them, and attributed any bleeding from the wounds to passive hemorrhage. Dr. Spitz believed the aspirated blood indicated Harmon took "a few breaths" immediately following the gunshot to his cheek.

¶ 25    On cross-examination, Dr. Spitz testified that he did not personally examine Harmon's body. Someone told him that the gunshot wounds and incised wounds occurred at separate times. He acknowledged that aspirated blood could have resulted from the incised wounds on Harmon's neck, but believed it was "much more likely" to have occurred due to the gunshot wound to the cheek. Dr. Spitz also acknowledged that Dr. Segovia did not note any brain stem injuries in her report.

¶ 26    Dr. Steven White, an assistant medical examiner for Cook County, testified as an expert in forensic pathology. He reviewed both Dr. Segovia's autopsy report and Dr. Spitz's report. The gunshot wounds to Harmon's shoulder and chest would not have been fatal, and Harmon likely could have spoken and breathed loudly afterwards. The gunshot to the cheek, however, implicated

Harmon's brain stem, and likely would have been "immediately lethal or lethal within a minute or two." Dr. White agreed it would have been possible for the aspirated blood in Harmon's lungs to result from the gunshot wound to Harmon's cheek. In his opinion, the incised wounds occurred postmortem based on the lack of hemorrhage and organ pallor.

¶ 27    Defendant entered both Graham's grand jury testimony and his videotaped statement, introduced as Defense Exhibit Nos. 5 and 6, respectively, into evidence. Both are included in the record on appeal.

¶ 28    In the videotaped statement, dated June 10, 2014, Graham stated that he accompanied Allen to the party at the house on Ross Avenue. When Graham and Allen arrived, they went to the front porch, where Hilliard gave them marijuana and firearms. They stayed near the front porch most of the night. At some point, Graham heard Harmon refuse to leave. Graham told Harmon to "chill out." Harmon did not calm down, and while Graham remained on the front porch, he saw Hilliard shoot Harmon twice. Graham saw Harmon's body on the ground motionless and believed he was dead, but was not certain. Shortly thereafter, Juan shot Harmon two more times. Defendant said they had to move the body, and Graham helped him move Harmon's body into the trunk of defendant's vehicle. Graham grabbed Harmon's legs while defendant grabbed his upper body. Graham and Allen drove away in another vehicle. While they drove away, defendant pulled up and said he planned to "drop" Harmon's body.

¶ 29    In the grand jury testimony, from July 2, 2014, Graham testified consistently with his videotaped statement. He further stated that he agreed to move Harmon's body out of fear for his life, and that when he and defendant brought the body around the back, the trunk was not already

open, and they placed the body on the ground first, and he did not witness defendant placed the body in the trunk.

¶ 30    Following closing arguments, the court found defendant guilty of six counts of aggravated kidnapping and one count of concealment of homicidal death, and acquitted him of the remaining counts. In so finding, the court credited Dr. Segovia's opinions over Drs. Spitz's or White's because Dr. Segovia personally examined Harmon's body. The court also found Allen's testimony credible, including the testimony that defendant stated he "cuts throat[s]" and that Harmon made noises as he was placed in defendant's vehicle. The court further emphasized that Allen received no "benefit" from his testimony, the presence of Harmon's blood in defendant's trunk corroborated Allen's testimony, and the testimony was in "large part, very consistent" with the statement Allen made to the police years earlier. The court also stated, "I cannot be convinced beyond a reasonable doubt that [Harmon] was, perhaps, still alive [when his] throat was slashed," though the court believed defendant made those wounds with the "intent to make sure *** Harmon was dead."

¶ 31    At a later proceeding, the court denied defendant's motion for a new trial. In so finding, the court stated that if Harmon were "obviously dead," defendant would not "get a knife," because, "You cut the throat of an individual to make sure that they say nothing against you." The matter moved to sentencing, where the court merged five counts of aggravated kidnapping into the count premised on defendant being armed with a dangerous weapon, and imposed 12 years' imprisonment. The court also sentenced defendant to a consecutive three-year prison sentence for concealment of homicidal death. The court denied defendant's motion to reconsider sentence.

¶ 32    On appeal, defendant argues that the evidence was insufficient to establish that he kidnapped Harmon while Harmon was alive, was armed with a dangerous weapon during the offense, or concealed Harmon's body knowing he was deceased.

¶ 33    When reviewing the sufficiency of the evidence, a court must construe all the evidence in the light most favorable to the State and determine whether any rational factfinder could have found the defendant guilty beyond a reasonable doubt. *People v. Murray*, 2019 IL 123289, ¶ 19. The reviewing court will not substitute its judgment for that of the factfinder regarding the weight of the evidence or the credibility of witnesses. *Id.* This is because the factfinder "heard and saw the witnesses, and, thus, was in a better position" to assess credibility, weigh the evidence, determine what inferences to draw from the evidence, and to resolve conflicts in the evidence. *People v. Wiley*, 205 Ill. 2d 212, 227 (2001). Reversal is improper unless the evidence is so unreasonable, improbable, or unsatisfactory that it gives rise to reasonable doubt of the defendant's guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 34    Defendant first argues that the evidence was insufficient to establish aggravated kidnapping because the State did not prove Harmon was alive when defendant placed him in the trunk of the Cadillac. The State does not contest defendant's position that a victim must be alive to be kidnapped, but maintains that the evidence demonstrated Harmon was alive at the time defendant placed him in the trunk.

¶ 35    As charged, a person commits aggravated kidnapping when he secrets another against his will while armed with a dangerous weapon. 720 ILCS 5/10-1, 10-2(a)(5) (West 2012).

¶ 36    The evidence shows that Harmon initially sustained gunshot wounds to his shoulder and chest, followed by another gunshot wound to his cheek. Allen testified that after the shootings,

defendant and Graham carried Harmon to defendant's vehicle. While they carried Harmon, Allen heard Harmon make noises as if he were snoring. According to Allen, defendant admitted to later stabbing Harmon. Dr. Segovia opined that the gunshot wounds were not immediately fatal and that Harmon was alive when he suffered the subsequent incised wounds. Defendant's experts, in contrast, testified that Harmon likely died within a minute or two of the gunshot to his cheek, which supports the competing inference that Harmon was dead before he was placed in the trunk. Additionally, Graham asserted in his statement to police that he believed Harmon was dead immediately following the gunshot to his cheek.

¶ 37    In finding defendant guilty, the court stated that it credited Allen's and Dr. Segovia's testimony over the conclusions of defendant's expert witnesses. In particular, the court referenced Allen's testimony regarding Harmon's noises and Dr. Segovia's testimony regarding Harmon's condition when he incurred the incised wounds. On this record, and with deference to the trial court's credibility determinations, we find that a rational factfinder could have found that Harmon was alive when defendant and Graham placed him in the trunk of the vehicle and defendant drove away.

¶ 38    On sufficiency of the evidence review, we must defer to the factfinder on matters of witness credibility. *Murray*, 2019 IL 123289, ¶ 19. The determination of whether Harmon was alive when defendant placed him in the trunk hinges on the factfinder's decision of whether to credit Allen and Dr. Segovia, or Graham and defense experts Drs. Spitz and White. The court favored Allen and Dr. Segovia, and as one was an eyewitness, and the other a certified expert in forensic pathology who examined Harmon's body firsthand, this finding was not based on evidence so improbable or unsatisfactory that reversal is appropriate.

¶ 39 Defendant argues that Allen's testimony could not rationally be credited because he was intoxicated during the party, testified inconsistently, and did not specify his location when he heard Harmon make sounds following the shooting. These arguments, however, do not permit this court to discard the credibility determination of the factfinder. To the contrary, it is the factfinder's role to assess credibility and resolve conflicts in the evidence, and the factfinder may choose to credit testimony despite its flaws. See *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004). Allen testified in detail about the events of the evening. The court knew of Allen's alcohol and marijuana intake, and chose not to weigh those facts against Allen's credibility. Allen did not waiver on whether Harmon made noises after sustaining the gunshot wound to his cheek in either his trial or grand jury testimony, and any inconsistency about Allen's location when hearing Harmon's sounds was not so egregious as to invalidate the testimony. The court discussed its bases for finding Allen credible, noting the overall consistency of his testimony with his original statement to police and the fact that physical evidence corroborated his testimony. Consequently, the factfinder's determination that Allen's version of events, including that Harmon was alive when placed in the trunk, was not so unreasonable that we may set it aside on review. This challenge to defendant's conviction for aggravated kidnapping therefore fails.

¶ 40 Defendant next argues that the State did not establish that he used a dangerous weapon for purposes of aggravated kidnapping, and as such, his conviction should be reduced to kidnapping.

¶ 41 To establish aggravated kidnapping as charged, the State had to prove that defendant "used a dangerous weapon" while committing a kidnapping. 720 ILCS 5/10-2(a)(5) (West 2012)). The statute defines the term "dangerous weapon" with reference to the Criminal Code of 2012, which describes a dangerous weapon, in relevant part, as a "knife with a blade of at least 3 inches in

length, dagger, dirk, switchblade knife, stiletto, axe, hatchet, or other deadly or dangerous weapon or instrument of like character." 720 ILCS 5/33A-1(c)(2) (West 2012). The indictment specifically alleged that defendant used "a dangerous weapon *** to wit: a knife."

¶ 42    The record shows that Harmon's body had incised and stab wounds to the neck and chest. Dr. Segovia described the incised wounds as caused by "something sharp." No witness testified as to what instrument caused the wounds, or saw defendant with a knife or other sharp implement. Allen, however, testified that some time after the incident, he heard defendant state that he does not shoot people, but cuts throats, and that he "stabbed" Harmon's body. The trial court found that the evidence of the wounds combined with defendant's statements allowed for the inference that while defendant secreted Harmon's body in the trunk, he was armed with a knife, stating defendant "was armed with a knife, by his own admission that, he cuts throats."

¶ 43    On this record, we find sufficient evidence for a rational factfinder to conclude that defendant used a knife during the kidnapping. As discussed, the court reasonably concluded that Harmon was alive when he sustained the incised and stab wounds. It follows that immediately prior to inflicting the wounds, defendant possessed a sharp implement, and that this occurred during the process of secreting Harmon in his trunk and transporting him to the alley. According to Allen, defendant stated he "stabbed" Harmon, and that he "cuts throats." These comments, in tandem with the injuries displayed in the photographs in the record on appeal, would permit a rational factfinder to conclude that the instrument defendant possessed was a knife, establishing the aggravating factor as charged.

¶ 44    Defendant argues, however, that no evidence demonstrates he used a "knife" specifically, as no knife was recovered, no witness testified that defendant had a knife, and defendant never

admitted using a knife. Thus, defendant contends, the evidence did not show that he used a knife instead of another sharp implement, rendering the evidence insufficient to prove the aggravating factor as charged. We disagree. On sufficiency of the evidence review, we must consider all the evidence in the light most favorable to the State, and draw all reasonable inferences in its favor. *Murray*, 2019 IL 123289, ¶ 19. Here, it is reasonable to infer from defendant's comments and Harmon's incised and stab wound injuries that defendant had a knife, a sharp implement commonly associated with stabbing. While it may have been possible that he used another implement, the factfinder was not required to raise any theory of innocence to the level of reasonable doubt. See *People v. Hall*, 194 Ill. 2d 305, 332 (2000).

¶ 45    Defendant also argues that no evidence demonstrated the blade of the knife was three inches long, citing *People v. West*, 2019 IL App (1st) 162400. The case is inapplicable, however, because there, the indictment specifically charged that the knife's blade exceeded three inches, and no evidence established the blade's length. *West*, 2019 IL App (1st) 162400, ¶ 21. Here, the indictment only charged possession of a knife, and as explained above, the trial court could reasonably infer that defendant used a knife. Additionally, prior cases have found that a knife need not be any particular length to qualify as a dangerous weapon per the statute. See *People v. Mares*, 2018 IL App (2d) 150565, ¶ 11.[3]

¶ 46    Defendant further argues that the evidence did not show he used a knife during the kidnapping because the wounds occurred after Harmon's body was transported to the alley,

---

[3] Defendant argues in his reply brief that in *Mares*, the State charged the defendant under the catch-all portion of the statute, and not with "a knife" as charged here. This argument does not address the central relevance of *Mares* to this case, however, as there the court stated, "a knife with a blade that is not at least three inches long can still be a deadly weapon," and the charging instrument here did not specify any particular blade length such that the length could become an element of the crime, as in *West*.

meaning Harmon was no longer "secretly confined" when defendant allegedly used the knife. This argument misconstrues the law. All the State had to show was that during the commission of the offense, defendant was "armed" with a dangerous weapon. 720 ILCS 5/10-2(a)(5) (West 2012). A defendant is "armed" with a dangerous weapon when he carries the weapon on or about his person, or had immediate access to or timely control over the weapon. *People v. Calloway*, 2019 IL App (1st) 160983, ¶¶ 34-37. Thus, it is of no moment that defendant did not threaten Harmon with the knife to force him into the trunk, or otherwise actively use the knife before stabbing Harmon in the alley with it. The fact that defendant used the knife sometime after placing Harmon in the trunk supports the reasonable inference that he possessed it on his person, or in an immediately accessible location, while driving Harmon to the alley.

¶ 47    In sum, a rational factfinder could find beyond a reasonable doubt that the implement defendant used to stab Harmon was a knife, and that defendant was armed with that knife during the commission of the kidnapping, *i.e.*, placing Harmon in the trunk and transporting him to the alley. These findings satisfy the statutory aggravating factor, and as such, defendant's claim challenging his conviction for aggravated kidnapping fails.

¶ 48    Finally, defendant claims the evidence is insufficient to establish concealment of homicidal death because it did not prove Harmon was dead when defendant placed his body in the trunk, and only established that Harmon died after being placed in the alley, where his body was no longer "concealed."

¶ 49    To demonstrate concealment of homicidal death, the State had to prove that defendant knowingly concealed Harmon's death while knowing the death was a homicide. 720 ILCS 5/9-3.4(a) (West 2012)). It is not enough that a defendant only withhold or fail to disclose knowledge

of the victim's death. 720 ILCS 5/9-3.4(b-5) (West 2012)). Instead, the defendant must undertake some affirmative act of concealment. *People v. Becerril*, 307 Ill. App. 3d 518, 528 (1999). The defendant must know the victim is dead when the concealment occurs. *People v. Salinas*, 365 Ill. App. 3d 204, 208-09 (2006).

¶ 50    As set out above, the trial court found that Harmon was alive when he was placed in the trunk. Defendant claims this establishes that he did not act with the knowledge that Harmon was dead at the time he affirmatively acted to conceal the body. Again, we disagree. The record here shows that defendant committed an affirmative act of concealment after knowing Harmon was dead; specifically, defendant left Harmon's body in the alley after the stabbing, at which time there is no dispute that Harmon was deceased. This satisfies the statutory definition of concealment, *i.e.*, "performing of some act or acts for the purpose of preventing or delaying the discovery of a death by homicidal means." 720 ILCS 5/9-3.4(b-5) (West 2012). A rational factfinder could infer that defendant's affirmative act of leaving Harmon's body in the alley was intended to delay the discovery that Hilliard shot Harmon at the party, where multiple witnesses viewed the shooting that undisputedly led to Harmon's death. See *People v. Clark*, 278 Ill. App. 3d 996, 1005 (1996) (concealment can occur when a body is "transported for the purpose of preventing or delaying the discovery of the homicide").

¶ 51    Defendant argues that leaving the body in a visible location in the alley would help facilitate, not conceal, the discovery of Harmon's death. But as discussed above, a rational factfinder could infer defendant intended to conceal the fact of Harmon's death by homicidal means by leaving Harmon's body in a different location from the shooting, and this is all the statute

requires. And as noted, on sufficiency of the evidence review, all reasonable inferences are drawn in favor of the State. *Murray*, 2019 IL 123289, ¶ 19.

¶ 52      To summarize, we find that the evidence was sufficient for a rational factfinder to conclude Harmon was alive when defendant placed him in the trunk, defendant was armed with a dangerous weapon during the commission of the kidnapping, and that defendant left Harmon's body in the alley with the intent to delay the discovery that Hilliard shot Harmon at the party. Accordingly, defendant's convictions are affirmed.

¶ 53      Affirmed.