2026 IL App (1st) 231052

FIRST DISTRICT
SECOND DIVISION
March 3, 2026

No. 1-23-1052

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 12238 |
| | ) | |
| ANGELO McCOY, | ) | Honorable |
| | ) | Neera Lall Walsh, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Van Tine and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1 A jury convicted defendant Angelo McCoy of aggravated kidnapping and aggravated criminal sexual assault. We affirm his convictions over several contentions of error, including insufficient evidence, instructional error, a deprivation of his sixth-amendment right to choose the objective of his own defense, and ineffective assistance of counsel.

¶ 2 BACKGROUND

¶ 3 I

¶ 4 On a Friday evening in July 2017, a routine request for a Lyft ride tragically turned into a kidnapping and sexual assault. The unsuspecting victim, A.R., was celebrating a colleague's upcoming wedding with some work friends. The festivities began with afternoon drinks in the office and continued at Rockit Bar in River North. After a few drinks (four to six, by her own estimate) over the course of several hours, A.R. grew tired and wanted to go home to her

Lakeview apartment. Around 11 p.m., she ordered a Lyft from her cellphone, and one soon arrived. A.R. identified defendant as her Lyft driver. Security footage from the bar shows her getting into defendant's SUV shortly after 11 p.m., and more generally, there was overwhelming evidence, as described below, to corroborate A.R.'s identification of defendant.

¶ 5     A.R. fell asleep during the ride. She awoke to find the SUV parked in a dark, unfamiliar alley. Her belongings, including her phone, were no longer with her in the back seat. Defendant, whose face A.R. could clearly see through the window, was opening the door and climbing into the back seat next to her. Sensing the impending danger, A.R. tried to flee out the other door. But defendant grabbed her, held her down, and warned her, "Don't make me angry." As A.R. struggled to break free, kicking and screaming, defendant tightened his grip and slammed her down by her neck. At this point, A.R. concluded that defendant would likely "kill" her if she kept fighting back and that her best chance to stay alive was to "remain calm," that is, to *not* fight back. With A.R. thus subdued, defendant bound her wrists, behind her back, with zip ties.

¶ 6     Defendant proceeded to sexually assault A.R., three times over. First, he sat her upright and forced his penis into her mouth. Then he turned her over, and after putting on a condom and pulling down her underwear, he forced his penis into her vagina. At the time, A.R. was on her menstrual period and wearing a tampon, which further aggravated her discomfort. She told this to defendant, hoping it would induce him to stop. He responded by penetrating her anally.

¶ 7     In no small part, A.R. feared that defendant would kill her because he had a knife. She could not "fully remember" when she first noticed it, but it was clearly before the sexual assaults began. As she testified, "the whole time I *** knew he had the knife" and "was just waiting for

him to stab me," and though he never "put it up to my throat to directly threaten to slit my throat or anything," Still, A.R. "assumed it was a threat" and believed her "life was in danger."

¶ 8      When defendant was done sexually assaulting A.R., he used the knife to cut off the zip ties. In the process, A.R. said, he cut one of her wrists "a little bit." Defendant also apologized for tying one of the zip ties too tightly.

¶ 9      Defendant got back into the driver's seat and asked A.R. for directions to her apartment. A.R. did not want to reveal her address to defendant, as she feared he would forcibly enter and either rape her again or kill her. So she directed him to a major intersection in her neighborhood, where she hoped to flee to safety. (At that moment, she was on the south side of Chicago, far from her home.) At her direction, defendant headed back north toward Lakeview.

¶ 10      Along the way, defendant used his own cellphone to record himself talking to A.R. A few snippets of this seemingly staged conversation will convey enough of its tone and tenor for our purposes here. For example, defendant complained about driving "tipsy" people. He asked A.R. why she was "delirious." He laughed and told her that there was something wrong with her when she said that she "didn't want to die." He asked if she was upset, to which A.R. responded that she was "tough" and would be alright. He also asked A.R. why her friends did not come along with her. After continuing in this vein for about 10 minutes, the recording ends with A.R. asking defendant for her identification back. Defendant does not audibly respond.

¶ 11      The end of the recording apparently coincided with their arrival at the intersection of Belmont and Ashland Avenues in Lakeview, around 1 a.m. As defendant approached a red light, A.R. grabbed her backpack from the cargo area and asked defendant for her other belongings,

including her wallet with her identification, which she saw in the front seat. At the light, A.R. jumped out of the SUV and ran to the car behind it, screaming for help, as seen on a video from a speed camera installed at the intersection. A.R. immediately opened the front passenger door of the car and got in.

¶ 12    The driver, John Draughan, was startled. But he quickly realized that A.R. posed no threat to him and that, indeed, she was the one in danger. Draughan testified that A.R. was "hysterical" and breathing heavily. But she did not appear intoxicated, and despite being upset, she was able to recount the preceding events in clear and graphic detail. Draughan let A.R. use his phone—A.R.'s was left behind in defendant's SUV—and drove her to the police station. At trial, Draughan identified defendant's SUV, which A.R. pointed out to him as it sped away from the intersection.

¶ 13    A.R. spoke to Sergeant Richard Jankowski and again recounted the evening's traumatic events. Her account was consistent, in all essentials, with her trial testimony. The police tried to locate defendant by tracking A.R.'s cellphone, but it appeared to be turned off. Other methods would later bear fruit. The police arranged for A.R. to be taken to the hospital.

¶ 14                                              II

¶ 15    Several key aspects of A.R.'s testimony were corroborated by overwhelming and largely undisputed evidence. For one, it is beyond dispute that defendant was A.R.'s Lyft driver. Her identification of defendant, and Draughan's identification of his SUV, were corroborated several times over. As we have noted, video footage shows A.R. getting into defendant's SUV at the bar and running out of it at the intersection of Belmont and Ashland Avenues.

¶ 16    Two days later, A.R. replaced her phone and accessed her Lyft receipt from the "cloud." The receipt showed a photo of her driver, named "Angelo"—that is, defendant—who picked her up at the bar at 11:06 p.m. on the night in question. Defendant's employment records with Lyft and Lyft's GPS records for his vehicle confirm his identity yet again.

¶ 17    Federal Bureau of Investigation Special Agent Joseph Raschke conducted a historical cell site analysis for A.R.'s phone. On the night in question, it accessed a tower facing Rockit bar at 11:07 p.m.; a tower near 70th and Pulaski, on the south side, at 11:47 p.m.; and a tower facing the intersection of Ashland and Belmont at 1:07 a.m. Agent Raschke's analysis thus coincided with A.R.'s testimony and the other evidence collectively showing that A.R. was taken on a two-hour Lyft ride from River North to Lakeview that included an extended detour to the south side.

¶ 18    When the police located and searched defendant's SUV, almost two weeks later, they found a knife in the center console, which A.R. identified as the knife she saw in defendant's possession. A photograph of the knife, offered as an exhibit, showed that its blade measured 2⅝ inches long. The police also found an unopened condom package in the seat pocket of the rear passenger seat, a Lyft decal, and defendant's chauffeur's license. No blood, semen, or usable DNA was found on the knife or in the swabbed areas of the SUV.

¶ 19    Dr. Hannah, the emergency physician who examined A.R. at the hospital, opined that her injuries were consistent with those of a sexual assault victim. His specific findings included redness and tenderness on A.R.'s outer labia, fresh blood in her anus, contusions on both of her wrists, and superficial abrasions on her feet. Dr. Hanna did not document any evidence of a knife wound to A.R's wrist. But photographs of her bruised wrists were introduced at trial, and she

identified a visible mark as the cut she sustained when defendant cut off the zip ties.

¶ 20    During the exam, samples were collected from A.R.'s mouth, vagina, anus, fingernails, and clothing and sent for DNA analysis. The samples contained predominantly female DNA, with a comparatively small amount of male DNA. For this reason, only a Y-STR analysis could be performed. The results, which were neither conclusive nor exculpatory, were introduced by way of stipulation. Defendant was "included as a possible donor" of the partial Y chromosome DNA identified in four of the samples, as follows:

— The partial profile in the non-sperm fractions of A.R.'s vaginal swabs would be expected to occur in approximately 1 in 490 unrelated white males, 1 in 440 unrelated black males, and 1 in 320 unrelated Hispanic males, based on a 95% confidence limit for each population.

— The partial profile in the left-hand fingernail scrapings would be expected to occur in approximately 1 in 2,400 unrelated white males, 1 in 2,000 unrelated black males, and 1 in 1,500 unrelated Hispanic males, again based on 95% confidence limits.

— For the partial profile in the left-hand fingernail swabs, it is 290 times more likely that defendant or a male paternal relative is the contributor, as compared to a randomly selected individual.

— For the partial profile in the right-hand fingernail swabs, it is 190 times more likely that defendant or a male paternal relative is the contributor, as compared to a randomly selected individual.

For the rest of the samples, the analysis was insufficient to either include or exclude defendant as

a possible contributor.

¶ 21                                    III

¶ 22     The State introduced other-acts evidence, in the form of testimony from K.B., who also

claimed that defendant sexually assaulted her in April 2014. She reported the sexual assault the

following day and was administered a sexual assault kit at the hospital. Over four years later, in

June 2018, Illinois State Police reported a Combined DNA Index System (CODIS) hit from

K.B.'s vaginal swabs to defendant.

¶ 23     According to K.B., late one evening in 2014, K.B. encountered a man she later identified

as defendant. K.B. was a drug addict and acknowledged that she was high at the time. K.B.

testified that defendant "catcalled" her as she walked down the street. She tried to distance

herself, but defendant blocked her path, forced her into his parked car, and drove her to a park.

When the car stopped, she tried to run, but defendant tackled her, pushed her head down, and

straddled her from behind. Defendant covered her mouth as she screamed and proceeded to

sexually assault her both vaginally and anally. Defendant laughed at K.B. as she pleaded with

him to stop. Throughout the assault, defendant repeatedly said, "I'm normal." Afterwards, he

asked K.B. for her address and suggested they go on a proper date.

¶ 24                                    IV

¶ 25    Defendant chose not to testify on his own behalf. Trial counsel, a private attorney, made

no opening statement to speak of, noting only that the constitution provides for jury trials and

that the defense would hold the State to its burden of proof. The first inkling of a defense theory

came in closing argument, when counsel conceded that defendant had a sexual encounter with

A.R. and argued that it was consensual. Trial counsel packaged this argument as a theory of reasonable doubt, despite the fact that consent is an affirmative defense that must be disclosed to the State before trial. And here it was not. In any event, counsel argued as follows: judging from circumstances, it would appear that A.R. consented to a sexual encounter involving her "fantasy" of "bondage." But defendant "went too far" and thus "offended" A.R., by starting the generally consensual encounter with oral sex, which A.R. apparently "doesn't like." And "perhaps" that misjudgment, as counsel painted it, was "why we're here today."

¶ 26    The jury convicted defendant of three distinct acts of aggravated criminal sexual assault, based on oral, vaginal, and anal penetration, and aggravated kidnapping while armed with a dangerous weapon other than a firearm. The indictment alleged that the dangerous weapon was, simply, "a knife." The jury was not instructed on the definition of a "dangerous weapon."

¶ 27    New private counsel filed an amended motion for a new trial. Relevant here, the amended motion claimed (1) the State failed to prove an *aggravated* kidnapping, because the knife did not meet the statutory definition of a "dangerous weapon" and was not used in a threatening manner; (2) it was error not to instruct the jury on the statutory definition of a "dangerous weapon"; (3) trial counsel was ineffective for presenting a defective consent defense; and (4) trial counsel was ineffective for stipulating to (unspecified) evidence throughout the trial. After denying the amended motion, the trial court sentenced defendant to an aggregate term of 62 years in prison.

¶ 28                              ANALYSIS

¶ 29                                  I

¶ 30    In his lead argument, defendant challenges the sufficiency of the evidence on the charge

of aggravated kidnapping. Specifically, he argues that the State failed to prove the aggravating factor and, thus, his conviction should be reduced to ordinary kidnapping, for two reasons. First, his knife did not qualify as a "dangerous weapon" under the statutory definition. And even if it did, he was not "armed" with the knife, principally because he did not "use" it to "effectuate" A.R.'s kidnapping.

¶ 31   To prove an aggravated kidnapping as charged, the State had to prove that defendant kidnapped A.R. "while armed with a dangerous weapon, other than a firearm, as defined in Section 33A-1 of [the Criminal] Code." 720 ILCS 5/10-2(a)(5) (West 2024). Section 33A-1 is part of the armed violence statute. *Id.* § 33A-1. Its definitions of a "dangerous weapon" and of "being armed" are incorporated into the aggravated kidnapping statute and thus establish the State's burden of proof on the aggravating factor.

¶ 32                                                    A

¶ 33   We begin with defendant's argument that his knife did not qualify as a dangerous weapon under the armed violence statute. Relevant here, section 33A-1 defines a "dangerous weapon" to include a "knife with a blade of at least 3 inches in length, dagger, dirk, switchblade knife, stiletto, axe, hatchet, *or other deadly or dangerous weapon or instrument of like character*." *Id.* § 33A-1(c)(2) (emphasis added). The italicized clause is sometimes known as the "residual clause" (*People v. Mares*, 2018 IL App (2d) 150565, ¶ 11), and we will use this terminology.

¶ 34   The indictment charges that defendant was armed with "a knife" of unspecified length. The police found a knife in defendant's SUV, and A.R. identified it as the knife he had during the kidnapping and sexual assaults. There is no dispute that the blade of this knife is 2⅝ inches

long. Because it is not a "knife with a blade of at least 3 inches in length," it is not one of the dangerous weapons explicitly enumerated in section 33A-1. So to qualify as a dangerous weapon under the statutory definition, it would have to qualify under the residual clause.

¶ 35    For ease of reference, we will call a knife like defendant's—one that falls short of the minimum three-inch blade length specified in the preceding clause—a "shorter knife." And we will call a knife that meets or exceeds the minimum blade length a "longer knife."

¶ 36    As a general matter, the residual clause applies only to "blade-type weapons"—in other words, "weapons or instruments that are sharp and have the ability to cut or stab"—that are not enumerated in the preceding clause. *People v. Davis*, 199 Ill. 2d 130, 139 (2002). A shorter knife will typically qualify as a "blade-type weapon[ ]." And it certainly can be "deadly or dangerous" on any reasonable, ordinary understanding of these terms.

¶ 37    As a matter of statutory construction, however, our supreme court has never decided whether a shorter knife can qualify as a "dangerous weapon" under the residual clause. The appellate cases have uniformly held that it can.

¶ 38    We have held for decades that section 33A-1 "does not preclude all knives with blades shorter than three inches from being characterized a dangerous weapon." *People v. Hall*, 117 Ill. App. 3d 788, 802-03 (1983). Rather, "[a]s the statute's residual clause indicates, a knife with a blade that is not at least three inches long can still be a deadly weapon." *Mares*, 2018 IL App (2d) 150565, ¶ 11. It follows that "a knife can be a deadly weapon" under section 33A-1 in one of two ways: "if its blade is at least three inches long or if it is an 'instrument of like character' as to the other weapons listed in section 33A-1(b)," which is to say, if it qualifies under the

residual clause. *In re T.G.*, 285 Ill. App. 3d 838, 846 (1996).

¶ 39     We have thus found that various knives—including both shorter knives and knives with unproven blade lengths—were dangerous weapons under the residual clause. *People v. Samier*, 129 Ill. App. 3d 966, 968-69 (1985) (unproven blade length, though evidently less than three inches); *People v. Westefer*, 169 Ill. App. 3d 59, 62 (1988) (1-inch utility blade); *People v. Charles*, 217 Ill. App. 3d 509, 512-13 (1991) (knife with 1.5 inches of broken blade remaining); *Hall*, 117 Ill. App. 3d at 805 ("big" knife); *Mares*, 2018 IL App (2d) 150565, ¶ 11 (box cutter with unproven blade length). And for some more recent non-precedential decisions to the same effect, see *People v. Villagran*, 2023 IL App (2d) 220186-U, ¶ 16, and *People v. Davis*, 2021 IL App (1st) 190813-U, ¶ 45.

¶ 40     To be clear, we are not saying that all shorter knives necessarily qualify as "dangerous weapons" under the residual clause. The State appears to take this overbroad position when it asserts, without qualification, that "[t]he statute's residual clause indicates that a knife, no matter the length of the blade, *is* a deadly weapon." (Emphasis added.) Defendant's objection to this position is well taken: by turning *all* knives into "dangerous weapons," regardless of blade length, this construction renders the three-inch blade requirement in the preceding clause superfluous. See *People v. Reed*, 2025 IL 130595, ¶ 25 ("When interpreting a statute, *** no part of the statute should be rendered superfluous or meaningless.").

¶ 41     But defendant also goes too far in arguing that the only way to give meaning to the three-inch blade requirement is to *categorically exclude* smaller knives from the scope of the residual clause. Rather, as we alluded to in *T.G.*, 285 Ill. App. 3d at 846, section 33A-1 establishes two

substantively different rules under which a knife may qualify as a dangerous weapon—one for longer knives and one for shorter knives. This point bears emphasis and elaboration.

¶ 42    For longer knives, section 33A-1 creates a bright-line rule: they are always dangerous weapons. Indeed, they are defined as dangerous weapons, because they are explicitly enumerated in the statute's list of such weapons.

¶ 43    For shorter knives, there is no bright-line rule. They are not enumerated in the statute, so they are not defined as dangerous weapons. But under the residual clause, a shorter knife may qualify as a dangerous weapon, depending on its overall characteristics—including but not limited to its blade length.

¶ 44    Spelled out in full detail, two things must be true for a weapon to qualify under the residual clause. First, the weapon must be "of like character" to the dangerous weapons listed in the preceding clause. 720 ILCS 5/33A-1(c)(2) (West 2024). For shorter knives, this is usually not much of a question: as we noted above, a shorter knife is generally "of like character" to the listed "blade-type weapons." See *Davis*, 199 Ill. 2d at 139. Second, the weapon must be a "deadly or dangerous weapon or instrument." 720 ILCS 5/33A-1(c)(2) (West 2024).

¶ 45    This might make the residual clause appear circular: a "dangerous weapon," as defined by the statute, can be a "deadly or dangerous weapon or instrument of like character" to the enumerated weapons. *Id.* But it simply reflects the fact that the residual clause requires a factual finding of dangerousness. And as we will explain in more detail below, this finding is not governed by any legal definitions or criteria of dangerousness. It is a common-sense determination, left to the jury, about the extent of the danger the weapon poses.

¶ 46    Put simply and in practical terms: if the State can establish at trial that the blade of the defendant's knife is at least three inches long, the jury should find, without further inquiry, that the knife was a dangerous weapon. But if the blade is less than three inches long—or, for that matter, if the State fails to establish its length—the jury will have to consider all of the knife's features and decide, as a matter of common-sense judgment, whether the knife, though on the smaller side, should nonetheless be considered a dangerous weapon.

¶ 47    This construction does not render the three-inch blade requirement "superfluous," ignore the statute's "plain language," or otherwise "contravene[ ]" principles of statutory construction. If anything, it is *defendant's* proposed construction of the statute—on which a shorter knife can *never* be dangerous weapon—that leads to "absurd" results. See *Reed*, 2025 IL 130595, ¶ 26.

¶ 48    The purpose of the armed violence statute, and related aggravated offenses, is to deter would-be felons from arming themselves with weapons that pose a heightened risk to life and limb. See 720 ILCS 5/33A-1(a)(1) (West 2024). In the legislature's reasoned judgment, not every knife necessarily warrants the significantly increased penalties imposed for this purpose. As the legislature saw matters, a larger knife will generally pose a grave enough threat to justify an aggravated charge as a matter of course. Put differently, there is a strong need to deter would-be felons from walking around with larger knives.

¶ 49    But a small enough knife may not call for such a heavy measure of deterrence. (Consider, for instance, a tiny Swiss-army style knife on a keychain.) That said, it would defy common sense to declare, as a bright-line rule, that a shorter knife can *never* be a dangerous weapon. A sharp one-inch utility blade can be dangerous, even deadly, in the wrong hands. See *Westefer*,

169 Ill. App. 3d at 62. The same goes for a box cutter—a small blade that has been wielded to notoriously deadly effect. See *Mares*, 2018 IL App (2d) 150565, ¶¶ 2, 11. Under defendant's proposed construction of the statute, the legislature saw no particular need to deter would-be felons from arming themselves with these sorts of knives. We find that implausible.

¶ 50                                                         B

¶ 51      Applying this construction of section 33A-1 to resolve defendant's sufficiency challenge is a simple matter. Since the finding of dangerousness required by the residual clause is a factual question for the jury, we review its determination under the deferential standard of *Jackson v. Virginia*, 443 U.S. 307 (1979). A rational trier of fact, viewing the evidence in the light most favorable to the State, could easily conclude that defendant's knife was a dangerous weapon.

¶ 52      The State's photographic exhibit depicts a knife with an obviously sharp point and what appears to be a sharp edge. More importantly, the knife cut through the zip ties that defendant used to bind A.R.'s wrists. A knife that can cut though zip ties can no doubt cut through human flesh and organs with relative ease. That is objective evidence of the knife's "ability to cut or stab" a person to dangerous, even deadly, effect. *Davis*, 199 Ill. 2d at 139; see *Westefer*, 169 Ill. App. 3d at 62 (utility knife, of the sort used to cut rugs, cardboard boxes, and other such things, was dangerous weapon). Thus, the jury—which saw both the photographic exhibit and the knife itself—could reasonably conclude that the knife was a dangerous weapon under section 33A-1.

¶ 53      Our decision in *People v. West*, 2019 IL App (1st) 162400, ¶¶ 20-32, cited by defendant, does not support his sufficiency challenge. In *West*, we reversed an armed violence conviction for insufficient evidence, where the State failed to prove that the blade of the defendant's knife

was at least three inches long. But the State's burden of proof in *West* was different than it is here, given the way that case was charged.

¶ 54     The indictment in *West* charged that the defendant committed the offense "while armed with *** a knife with a blade of at least 3 inches in length." *Id.* ¶ 21. Because the State alleged that the defendant was armed with one of the dangerous weapons enumerated in section 33A-1, that is the type of weapon it had to prove up at trial. *Id.* ¶ 22. It may have been true, as the State argued on appeal, that the knife would have qualified as a dangerous weapon and, thus, that the case "could have" been charged under the residual clause. *Id.* But it wasn't. And allowing the State to invoke the residual clause for the first time on appeal would deprive the defendant of his due-process right to notice and a fair opportunity to defend against the charge. *Id.*

¶ 55     There is no such question of notice here. Unlike *West*, this case *was* charged under the residual clause. The indictment alleged that defendant was armed with "a knife" of unspecified length, not a knife with at least a three-inch blade. So the State did not have to prove that defendant knife's had at least a three-inch blade. (Strictly speaking, it did not have to prove the length of the blade at all.) It had to prove that the knife, though its blade was less than three inches long, was still a dangerous weapon under the residual clause. And the State's evidence was sufficient on this point. The first part of defendant's sufficiency challenge thus fails.

¶ 56                                             C

¶ 57     The second part of defendant's sufficiency challenge is that the State failed to prove that defendant "used" the knife to "effectuate" A.R.'s kidnapping. This argument betrays a misunderstanding of the residual clause and the difference between the statutory definition and a

similar, but different, definition under the common law. Unfortunately, some of our case law has fallen into this same trap. We explain below.

¶ 58    Section 33A-1 defines a dangerous weapon for the purposes of certain aggravated offenses. For offenses that are *not* governed by this statute, a dangerous weapon is defined by common law. Our supreme court has noted that the statutory definition, enacted for specific purposes that we briefly discussed above, is distinct from and narrower than the common-law definition. *People v. Ligon*, 2016 IL 118023, ¶¶ 26-27. It is thus critical that courts avoid importing elements of the common-law definition into the statutory context.

¶ 59    In particular, the common law distinguishes between inherently or *per se* dangerous weapons, on the one hand, and ordinary items that are *used* as dangerous weapons, on the other. *People v. Ross*, 229 Ill. 2d 255, 275 (2008); Illinois Pattern Jury Instructions, Criminal, No. 4.17 (approved Dec. 8, 2011) ("IPI Criminal No. 4.17") ("An object or an instrument which is not inherently dangerous may be a dangerous weapon depending on the manner of its use and the circumstances of the case."). Both categories of items count as "dangerous weapons" but for different reasons. Some items are properly considered weapons in their own right. For other items—like a hammer—it is the manner and circumstances of their (irregular) use that turns them into dangerous weapons.

¶ 60    As noted above, this common-law distinction is set forth in IPI Criminal No. 4.17. The committee note states the instruction should not be given when, as here, "the term 'dangerous weapon' is expressly defined by statute." IPI Criminal No. 4.17, Committee Note. Put simply, the common-law distinction does not apply to section 33A-1. Indeed, importing it will distort the

statute in two ways.

¶ 61    First, the common law has generally considered *all* knives, regardless of blade length, to be inherently or *per se* dangerous weapons in this sense. *People v. Lindsay*, 263 Ill. App. 3d 523, 528 (1994). There is an obvious point to saying that knives, in general, are dangerous weapons. But whatever sense this principle makes in the context of the common-law distinction, importing it into section 33A-1 would render the statute's three-inch blade requirement meaningless, for the reasons we discussed above. And it would nullify the particularized finding of dangerousness that the residual clause requires.

¶ 62    This common-law understanding of knives is essentially the State's overbroad position in this case. And in fairness, our own cases are not entirely immune from this error. In *Westefer*, 169 Ill. App. 3d at 61-62, for example, we relied on common-law precedents to find that a knife with a one-inch blade qualified was a dangerous weapon under the residual clause because it was "an inherently dangerous weapon" or "deadly *per se*." The confusing analysis in *Westefer*, though it reached a sound result, strayed far from the terms of the residual clause and the findings it requires. Relying on common-law precedents in the statutory context is all too likely to have that effect. In fact, it also seems to have led to another, far more prevalent, error in our cases. Which brings us to our second point.

¶ 63    Recall that a shorter knife qualifies as a dangerous weapon under the residual clause if the jury makes a common-sense factual finding of dangerousness. Several (though not all) of this court's decisions have used the common-law distinction—between inherently dangerous weapons and other items that are used, in that particular instance, as dangerous weapons—to

explain the required finding. With citations tracing back to common-law precedents, these cases have thus held that a shorter knife qualifies as a dangerous weapon under the residual clause if the knife is *used* in a dangerous manner in the commission of the offense.

¶ 64    As one typical case summed up the point: "[W]hile a knife with a three-inch blade is *per se* a dangerous weapon pursuant to section 33A-1, similar instruments fall within the purview of the statute if it is established that they became a dangerous weapon when used in a manner dangerous to the physical well-being of the individual threatened." *Hall*, 117 Ill. App. 3d at 802-03; see *T.G.*, 285 Ill. App. 3d at 847-48; *Charles*, 217 Ill. App. 3d at 513; *Samier*, 129 Ill. App. 3d at 969; *Villagran*, 2023 IL App (2d) 220186-U, ¶ 16. That clearly imposes the common-law distinction on the statute.

¶ 65    Yet the residual clause of section 33A-1 says nothing about how the weapon is *used*. And reading it as such will distort the statutory element of being "armed."

¶ 66    If a shorter knife counts as a dangerous weapon because of how it is *used*, it follows that a defendant must actually *use* his shorter knife in the commission of the offense—or else there will be no way to find that he committed the offense while "armed with a dangerous weapon" and thus no basis for convicting him of an aggravated offense. See 720 ILCS 5/10-2(a)(5), 33A-1(c)(1) (West 2024). That, indeed, is the second half of defendant's sufficiency challenge in a nutshell—that there was no evidence that he *used* the knife in the commission of the offense.

¶ 67    For the reasons we will explain in more detail below, the premise of defendant's argument is wrong as a matter of law: a defendant can be *armed* with a dangerous weapon, for purposes of section 33A-1, without *using* the weapon during the offense. *People v. Drakeford*,

139 Ill. 2d 206, 210 (1990) ("To violate the [armed violence] statute, a person need not actually use a dangerous weapon in the commission of a felony; rather, a person need only carry a dangerous weapon while committing a felony."). In fairness to defendant and his appellate counsel, it is not only his sufficiency challenge that distorts this statutory element. Our own applications of the residual clause to shorter knives, at times, have done the same.

¶ 68    To say it simply, contrary to defendant's argument, the State did not have to prove that defendant "used" his knife, in a "dangerous or deadly manner" or otherwise, to "get" or "keep" A.R. in the SUV or to "effectuate" the kidnapping. Tellingly, defendant derives these purported elements of the State's burden of proof from *Samier*, 129 Ill. App. 3d at 969, one of our cases that erroneously imposed the common-law understanding on the statute. The statute itself says that the State had to prove the following: that defendant "commit[ted] the offense of kidnaping *while armed with* a dangerous weapon, other than a firearm, as defined in Section 33A-1." 720 ILCS 5/10-2(a)(5) (West 2024) (emphasis added).

¶ 69    As noted above, the aggravated kidnapping statute incorporates the element of being "armed with a dangerous weapon" from the armed violence statute. "A person is considered armed with a dangerous weapon for purposes of [the armed violence statute] when he or she carries on or about his or her person or is otherwise armed with" the weapon. *Id.* § 33A-1(c)(1). And a person is "otherwise armed" if he or she has "immediate access to or timely control over" a dangerous weapon. *People v. Harre*, 155 Ill. 2d 392, 396 (1993); *People v. Condon*, 148 Ill. 2d 96, 110 (1992); *People v. Calloway*, 2019 IL App (1st) 160983, ¶ 37.

¶ 70    Again, to be "armed with a dangerous weapon," for purposes of the armed violence

statute and other offenses that incorporate this element, "a person need not actually *use* a dangerous weapon in the commission of a felony." *Drakeford*, 139 Ill. 2d at 210 (emphasis added). Even less does the statute say that the dangerous weapon must be used to "effectuate" the underlying felony. In our legislature's judgment, simply having ready access to a dangerous weapon during the course of a felony creates a significant enough risk of violence and serious harm to merit an aggravated charge with heightened penalties. See *Calloway*, 2019 IL App (1st) 160983, ¶ 25. So ready access to the knife, during the kidnapping, is all the State had to prove.

¶ 71     It could hardly be clearer from A.R.'s testimony that defendant had "immediate access to or timely control over" the knife. For one, he cut the zip ties with it. It is no objection that this was not a "deadly or dangerous" manner of *use*; the point is simply about defendant's access to the knife. And A.R. was aware of the knife long before that, even before the sexual assault: it is why she feared that defendant would kill her if she kept resisting and trying to escape from the SUV. This was only possible because the knife, as seen from A.R.'s first-hand perspective, was readily accessible to defendant, though the details on this topic are admittedly sketchy.

¶ 72     And to put a finer point on it: the knife was readily accessible to defendant *during the kidnapping*. In arguing otherwise, defendant points out that "A.R. got into the SUV willingly, although unaware of [defendant's] deceit, but never testified that she saw the knife when she got into the vehicle." At the earliest, defendant says, A.R.'s testimony may have established that she first saw the knife "at the beginning of the sexual assault." And "at most," he continues, he may have "displayed a knife during the commission of an aggravated criminal sexual assault." But not during the kidnapping.

¶ 73    Defendant's argument assumes that the kidnapping was complete when A.R. first became aware of the knife, sometime in the moments leading up to the sexual assault. That assumption is wrong. The kidnapping was not a discrete event confined to the moment "when [A.R.] got into the vehicle." It was a continuing event that *began* when A.R. got into the vehicle and *lasted* until she could flee to safety some two hours later—when, at long last, defendant was no longer "carr[ying]" her "from one place to another *** against *** her will." 720 ILCS 5/10-1(a)(2) (West 2024).

¶ 74    If nothing else, A.R. testified that defendant had ready access to the knife immediately before and immediately after the sexual assault. Because that entire series of events took place during the course of the ongoing kidnapping, defendant was "armed with a dangerous weapon" while committing that offense. The evidence was sufficient to prove an aggravated kidnapping.

¶ 75                                                    II

¶ 76    The jury was instructed that, to find defendant guilty of aggravated kidnapping, it had to find that he committed the offense of kidnapping "while armed with a dangerous weapon other than a firearm." See IPI Criminal Nos. 8.04, 8.05. But the jury was not instructed on the definition of a "dangerous weapon" under section 33A-1.

¶ 77    Defendant says this was a "substantial defect" in the jury instructions under Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013). He also claims that trial counsel was ineffective for not insisting on a proper jury instruction, and that post-trial counsel was ineffective for improperly presenting the jury-instruction issue in the post-trial motion.

¶ 78    The State says this argument was forfeited. It is true that defense counsel did not object to

the absence of the jury instruction. As defendant notes, however, at the hearing on the amended post-trial motion, the parties did debate the giving of a jury instruction on this issue. The problem, as defendant also notes, is that post-trial counsel did not argue the issue correctly. Post-trial counsel referenced IPI Criminal No. 4.17, which (as explained above) governs the common-law definition of "dangerous weapon" and which, in the committee note, expressly warns: "Do not give this instruction in armed violence cases, *aggravated kidnapping cases*, or in other cases where the term 'dangerous weapon' is expressly defined by statute." IPI Criminal No. 4.17, Committee Note (emphasis added).

¶ 79     All in all, the post-trial discussion of this issue was a bit of a mess. Post-trial defense counsel argued that the common-law definition under IPI Criminal No. 4.17 should have been given, and the trial court ruled that, even without IPI Criminal No. 4.17, the jury could have found that the knife here was an "inherently dangerous weapon," again under the common-law definition. But in fairness, the trial court was relying on *Samier*, which (as discussed above) imported the common-law definition of "dangerous weapon" into the statutory definition under section 33A-1.

¶ 80     The forfeiture doctrine is a limitation on the parties, not this court, and we may relax the rule to ensure a sound body of precedent. *People v. Acosta*, 2024 IL App (2d) 230475, ¶ 15. Particularly given the confusion in this area of the law, we are not inclined to find forfeiture here. We will treat the issue as properly preserved and determine, as always when instructional errors are preserved, whether an error occurred and whether that error was harmless. *People v. Hartfield*, 2022 IL 126729, ¶ 42.

¶ 81    As noted, defendant also complains of ineffective assistance from his lawyers, both trial counsel's failure to insist on a proper jury instruction and post-trial counsel's mishandling of the issue. In appellate review, defendants typically rely on an ineffective-assistance claim to avoid forfeiture, which is unnecessary here. Still, we will consider defendant's ineffective-assistance claim, as well. To demonstrate ineffective assistance, defendant must show (1) his attorney's deficient performance and (2) prejudice—a reasonable probability that he would have been acquitted absent that deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687, 695 (1984); *People v. Simpson*, 2015 IL 116512, ¶ 35. If he fails to establish either prong, his claim fails. *Simpson*, 2015 IL 116512, ¶ 35.

¶ 82    Under either defendant's (non-forfeited) argument that it was error not to give the appropriate jury instruction or his *Strickland* claim of ineffectiveness, our answer is the same: as the evidence against defendant was overwhelming, the absence of an instruction defining a "dangerous weapon" did not impact the outcome of the case in any measurable way. So any error was harmless, and any deficient performance did not prejudice defendant.

¶ 83    When the jury is instructed on the aggravating factor charged here, the trial court should "give the definition of the term 'dangerous weapon' which is found in 720 ILCS 5/33A-1." IPI Criminal No. 8.04, Committee Note. The trial court did not do so. It should have. And defense counsel should have insisted on it or objected. So defendant has established error and deficient performance.

¶ 84    But defendant cannot establish prejudice from these errors. The crux of his prejudice argument is that, without the statutory definition in hand, the jury had no way to know that his

shorter knife did not qualify as a "dangerous weapon" under the statute, since its blade was less than three inches long. This argument assumes, as a premise, the statutory construction that we have already rejected as a matter of law. For the reasons we have explained, a shorter knife like defendant's can qualify as a "dangerous weapon" under the residual clause.

¶ 85     To decide whether defendant's knife qualified as a "dangerous weapon" under the residual clause, as set forth in the proper instruction that was not given, the jury would have to make two findings. First, the jury would have to decide whether defendant's knife was "of like character" to the dangerous weapons listed in the preceding clause of the statute. 720 ILCS 5/33A-1(c)(2) (West 2024). As we noted above, a weapon is "of like character" if it is a "blade-type weapon[ ]" that is "sharp and ha[s] the ability to cut or stab." *Davis*, 199 Ill. 2d at 139. Defendant's knife obviously satisfied this general description and thus potentially qualified as a dangerous weapon.

¶ 86     And second, having decided that threshold question in the State's favor, the jury would have to decide whether defendant's knife was a "deadly or dangerous weapon or instrument." 720 ILCS 5/33A-1(c)(2) (West 2024).

¶ 87     An instruction setting forth the section 33A-1 definition would not provide the jury with any precise criteria or other principled guidance to help it decide this second question. As we explained earlier, the statute calls upon the jury to make a fact-specific, common-sense judgment regarding the dangerousness of defendant's knife. (As would the common law, for what it's worth: IPI Criminal No. 4.17 is equally lacking in criteria or other guidance for the jury to apply.) Defendant complains that the lack of an instruction setting forth the statutory definition

left the jury "to its own devices" in deciding whether his knife was a dangerous weapon. Truth be told, a proper instruction would have done the same.

¶ 88    The error in failing to give this instruction was harmless. There is no reasonable probability—in our view, virtually no possibility—that the jury's common-sense judgment would have favored defendant. As we noted in the context of his sufficiency challenge, there was clear, objective evidence that his knife was a dangerous weapon. A knife sharp enough to cut through zip ties can no doubt cut through human flesh. And the knife was not *so* short that it could only inflict superficial damage. Nothing in the missing instruction would have led a reasonable jury to find that the knife was not dangerous. The instruction should have been given, but our confidence in the jury's verdict remains intact.

¶ 89                                        III

¶ 90    Invoking the rule of *McCoy v. Louisiana*, 584 U.S. 414 (2018), defendant claims that trial counsel usurped his sixth-amendment right to "autonomy"—that is, the right to decide on the objective of his defense—by conceding in closing argument that defendant was guilty of sexually assaulting A.R. As we will explain, we find *McCoy* inapplicable here.

¶ 91    In *McCoy*, the capital defendant "vociferously" maintained his innocence in the face of seemingly overwhelming evidence against him. *Id.* at 417. To this end, he took the stand at trial and "press[ed] an alibi difficult to fathom." *Id.* at 419-420. Sensing the futility of this approach, and mindful of the death-penalty phase to come, counsel took a different tack: notwithstanding his client's alibi testimony, counsel unequivocally conceded guilt. *Id.* at 420.

¶ 92    In the defense's opening statement and closing argument, counsel thus told the jury, in no

uncertain terms, that "unambiguous" evidence proved that "my client committed three murders." *Id.* The obvious strategic purpose of counsel's unauthorized concession was to afford his client "the best chance to avoid a death sentence" by accepting responsibility for the murders and shifting the jury's focus to his "serious mental and emotional issues" as mitigating factors. *Id.*

¶ 93     In so doing, counsel in *McCoy* usurped the defendant's sixth-amendment right "to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." *Id.* at 417-418. Even in the face of overwhelming evidence against him, a defendant has an unqualified right to choose between these competing objectives. *Id.* He might, for instance, view life in prison as a fate worse than death and thus reject a mitigation strategy in favor of an all-or-nothing chance of acquittal, no matter how remote. *Id.* at 423. Or he "may wish to avoid, above all else, the opprobrium that comes with admitting" that he committed a particularly heinous crime, such as murdering his own family. *Id.* at 422-23.

¶ 94     Whatever his reasons, this is a defendant's own "personal" decision. *Id.* at 421. And when he has made his decision known, counsel has no authority to pursue a conflicting objective in the name of trial strategy. *Id.* at 423. Counsel's role is to make reasonable "strategic choices about how best to *achieve*" the client's chosen objective through effective "[t]rial management." *Id.* at 422-23 (emphasis in original). Counsel thus decides "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." *Id.* at 422.

¶ 95     If counsel pursues a trial strategy that contradicts the defendant's expressed decision, it is

no answer that counsel's preferred strategy was reasonable in light of the evidence; the sixth-amendment right to autonomy is entirely distinct from the right to effective representation. *Id.* at 426. Nor does the strength of the evidence matter. Unlike a *Strickland* violation, usurping the defendant's sixth-amendment right to autonomy is a "structural" error that requires automatic reversal, without any showing of prejudice. *Id.* at 426-27.

¶ 96    It is not clear that *McCoy*'s holding has any meaningful application outside of the death-penalty context. And defendant cites no case finding one. His only other cited authority is *People v. Hattery*, 109 Ill. 2d 449, 459-60 (1985), a pre-*McCoy* case that our own supreme court decided under the framework of *United States v. Cronic*, 466 U.S. 648 (1984). In *Hattery*, as in *McCoy*, counsel conceded his client's guilt in a capital case for the purpose of developing a mitigation argument to be used at sentencing. *Hattery*, 109 Ill. 2d at 458-59. And as in *McCoy*, the concession in *Hattery* was a full-throated concession of guilt: "We are not asking you to find Charles Hattery not guilty," counsel told the jury, but rather to "consider *** why he did the horrible thing that he did" and thus find a reason not "to impose the death penalty." *Id.* at 458-59.

¶ 97    As these cases illustrate, conceding guilt at trial—as opposed to pleading guilty—is a strategy that generally finds its home in the death-penalty context. Though we are skeptical, we need not decide, once and for all, whether a set of facts could ever arise in a non-capital case that would warrant an extension of the *McCoy* rule into this very different legal context. For our purposes, it will suffice to say that *McCoy* is inapplicable for another, simpler reason: counsel here did not concede defendant's guilt.

¶ 98    What counsel conceded, in closing argument, is that defendant and A.R. had a sexual

encounter during the Lyft ride. That alone is not a concession that defendant was guilty of sexual assault, for counsel claimed the sex was consensual. See 720 ILCS 5/11-1.70(a) (West 2024) (consent is defense to aggravated criminal sexual assault). Even if counsel's theory of consent was not "viable" in one or more respects, as defendant says, it was still a theory of innocence, not a concession of legal guilt.

¶ 99     The crux of defendant's appellate argument seems to be that counsel pulled the rug out from under his own feet. As a result, counsel did not really articulate a defense of consent (or anything else) at all. When all was said and done, says defendant, counsel's closing argument had effectively collapsed into a concession of guilt.

¶ 100   For example, he notes, in the same breath as "consent," counsel also said that defendant "went too far" by commencing the encounter with oral sex. Defendant objects that this remark "completely contradicts" counsel's theory of consent: by conceding that defendant overstepped the limits of A.R.'s consent, counsel essentially conceded that there wasn't consent after all, at least for the charges based on oral penetration. For what it's worth, we are skeptical of this interpretation of counsel's remark, though we acknowledge that counsel walked a fine linguistic line.

¶ 101   We are more inclined to interpret counsel's remark, within the context of his overall argument, as something like a mistake-of-fact argument embedded within an overarching theory of consent: A.R. supposedly consented to living out A.R.'s "fantasy" of "bondage" with her Lyft driver, thus leading defendant to believe—incorrectly as it turned out—that oral sex, along with vaginal and anal sex, was part of the fantasy.

¶ 102    No doubt, this defense theory was not only demeaning but unsupported by even a shred of evidence. But that doesn't make it a concession of guilt. Indeed, on *either* interpretation of counsel's remark—as advancing a factually unsupported theory (as we see it) or as undermining the conceptual basis of the defense (as defendant says)—the potential objection that arises here pertains to counsel's *effectiveness* in arguing a theory of innocence. Counsel did not usurp defendant's sixth-amendment right to choose the objective of his defense; for better or worse, counsel simply chose "which arguments to pursue" in the quest for acquittal. *McCoy*, 584 U.S. at 422. That the arguments allegedly unraveled in counsel's hands does not turn them into a strategic concession of guilt. It means that counsel was allegedly ineffective. And the framework for analyzing *that* objection is *Strickland*, not *McCoy*.

¶ 103    Similarly, counsel insisted that A.R. was intoxicated, though the evidence on this point was thin. This insistence was potentially self-defeating, defendant suggests, because a victim's intoxication can negate a defense of consent. See *People v. Fisher*, 281 Ill. App. 3d 395, 402-03 (1996). At most, this might be another example of counsel undercutting his own argument. And that is just one more *Strickland* objection. It is not a strategic concession of guilt.

¶ 104    These examples will suffice to make the general point: defendant has not identified, and we cannot discern, *any* example of a strategic concession of guilt that implicates the *McCoy* rule. To the contrary, counsel consistently asked the jury to "find Angelo McCoy not guilty because we don't believe that the State has met their burden of proof" on any of the charges.

¶ 105    In short, counsel never conceded defendant's guilt, and that conclusion alone disposes of his claim.

¶ 106                                             IV

¶ 107   Defendant's final claim is one of ineffective assistance. Trial counsel's alleged deficiency was not one discrete error, he says, but rather a cluster of related errors pertaining to counsel's handling of the DNA evidence. Defendant adds that post-trial counsel was also ineffective for failing to raise the issue below.

¶ 108   We start with the claim that trial counsel was allegedly ineffective for stipulating to the results of the DNA analysis. To be clear, defendant does not claim that the DNA analysis was substantively wrong, that the samples were mishandled, or anything else that would impugn the *validity* of the results presented in the stipulation. Rather, defendant claims that counsel failed to educate the jury about the inherent limitations of Y-STR analysis and thus left the jury to overestimate its probative value in this case. Instead of stipulating to the results of the analysis, defendant says, counsel should have cross-examined the DNA expert and used the examination as a forum for educating the jury on the relevant points.

¶ 109   At most, defendant says, a Y-STR analysis can determine "whether [someone] cannot be excluded as a contributor to the evidentiary profile." And the analysis is limited, in part, because all paternal male relatives—fathers, sons, uncles, brothers, paternal cousins—share the same Y-chromosome profile. These points, in defendant's view, were not properly explained to the jury. What's more, for A.R.'s vaginal swabs, the jury was not told just *how* partial the "partial profile" was, in terms of the number of loci tested. Nor was the jury told that the "frequencies" of the partial profiles presented in the stipulation depended on the size of the database searched and other technical factors. Lastly, the jury was not informed that a "95% confidence limit" is a tool

used to account for variations in database size and not "a measure of the analyst's confidence that [defendant's] DNA was found on A.R.'s vaginal swabs."

¶ 110   The stipulation did not overstate the ability of Y-STR testing to identify defendant as the source of the DNA profiles. It was perfectly clear that he "was included as a *possible* donor" in certain profiles, from the vaginal and fingernail swabs, and nothing more. Granted, the jury *may* have misunderstood the technical meaning of the unexplained "95% confidence limit." But it bears repetition: for the vaginal swabs, as for all swabs, the stipulation said that defendant "was included as a possible donor," not that his DNA "was found" in the sample. So if anything, the jury may have thought that the analyst was 95% confident—*only* 95% confident, meaning less than certain—that defendant was even a *possible* donor. And that potential misunderstanding hardly cuts in the State's favor.

¶ 111   There are further responses to defendant's objections, taken individually, but there is also a broader and more important point to be made. The DNA analysis obviously could not establish, and did not purport to establish, whether the admitted sexual encounter between defendant and A.R. was consensual or criminal. And that had nothing to do with its limitations as a Y-STR (as opposed to autosomal) analysis. The DNA evidence was largely immaterial to the defense theory of consent, and there was nothing to be gained by cross-examining the expert on the limitations of this particular form of DNA analysis. The stipulation did not prejudice the defense of consent that counsel chose to pursue.

¶ 112   Defendant answers that counsel's own misunderstanding of the DNA results is what led him to pursue a defense of consent in the first place. Defendant also says that counsel failed to

"investigate" the DNA results, which we take to mean the same thing. The idea is that counsel took the DNA analysis to be more conclusive than it actually was. So it seemed hopeless, from counsel's ill-informed perspective, to deny that defendant had any sexual encounter with A.R. at all. Which left consent as the only option. And not a good one, at that.

¶ 113   There is no evidence in the record of counsel's "understanding" or "investigation" of the DNA results. Apart from the choice of defense theory, a topic we will return to in a moment, all that defendant can point to is counsel's failure to object to the prosecutor's statement, in closing argument, that "defendant's DNA was found in [A.R.'s] vagina." An overstatement, perhaps, but also argument. And in any event, counsel reasonably could have thought that there was nothing to be gained by objecting, just as there was nothing to be gained from putting the DNA expert on the stand, since defense counsel was conceding the fact of a sexual encounter. The lack of an objection to this argument is neither clear evidence that counsel misunderstood the DNA analysis nor a reason to find counsel ineffective.

¶ 114   Because these matters were not addressed in the post-trial motion, we cannot know what trial counsel actually thought about the Y-STR analysis or how that understanding may have shaped counsel's choice of defense theory. But even if we assume, for the sake of argument, that counsel opted for a defense of consent because he overestimated the Y-STR analysis, defendant would still have to show that he was prejudiced by counsel's resulting choice of strategy.

¶ 115   To that end, defendant would have to establish that he had a reasonably probable chance of winning an acquittal, if only counsel had exposed the limitations of the Y-STR analysis and effectively marshalled other available evidence tending to show that he did not have a sexual

encounter with A.R. at all. If he did, and if counsel opted for a hopeless defense of consent instead, then he was prejudiced by ineffective representation.

¶ 116   But defendant cannot establish prejudice, and we dispose of his *Strickland* claim on this basis alone. See *Simpson*, 2015 IL 116512, ¶ 35. In all fairness, defendant is likely correct that the theory of consent articulated by counsel did not stand any real chance of prevailing. Key aspects of this theory, as we noted above, were unsupported by any semblance of evidence. But we need not dwell on the shortcomings of counsel's theory. The dispositive point is that the alternative had no reasonable probability of prevailing, either.

¶ 117   The cornerstone of the State's case was not the DNA evidence. It was A.R.'s testimony, which was clear and detailed; consistent with her immediate outcries to Draughan, the police, and the emergency physician; and corroborated, on numerous points, by a wealth of objective and undisputed evidence. The DNA analysis was only one small piece of the corroboration. As the prosecutor emphasized, it was "all of the evidence added up" that "corroborated" A.R.'s "story," not the DNA evidence alone.

¶ 118   And make no mistake: while the Y-STR analysis could not provide conclusive proof that defendant had sex with A.R., it was emphatically not exculpatory. Defendant was "included as a possible donor" of the (partial) male profiles found in A.R.'s vagina and fingernails. For the other samples, the analysis was "insufficient to support either inclusion or exclusion," as the stipulation stated. So defendant was never *excluded* as the source of any DNA. The analysis did not prove that any of it came from someone other than him.

¶ 119   Emphasizing the limitations of the Y-STR analysis would have done little to undercut the

credibility of A.R.'s testimony. For example, explaining that defendant's paternal male relatives share the same Y-chromosome profile on which the Y-STR analysis is based would not impeach A.R.'s claim that it was defendant who sexually assaulted her—unless there had been some evidence pinning the assault on one of defendant's paternal male relatives, which obviously was not the case here.

¶ 120    To undercut A.R.'s testimony, the defense would have to do far more than lecture the jury on the limitations of Y-STR analysis. So what else does defendant have to offer? A series of unrelated, minor impeachments that hardly dent the overall credibility of A.R.'s account. And in some cases, defendant's points are misleading to boot.

¶ 121    For example, defendant is correct that A.R. had been drinking and fell asleep during the ride. The jury knew this. The jury also knew that her drinks were consumed over the course of many hours, and that Draughan, who encountered A.R. not long after the fact, testified that she was lucid and clear, albeit visibly shaken, and did not appear intoxicated. What's more, A.R. had the presence of mind to misdirect defendant away from her home, so she could flee to safety in a neutral place. Clearly, she was not so drunk or disoriented that she could not reliably recount the basic trajectory of a sexual assault or confirm that her assailant was the same person who was driving the SUV. And when she was unsure of something in her account, she said so—for example, not remembering precisely when she first became aware of defendant's knife.

¶ 122    Dr. Hanna's testimony did not, as defendant contends, significantly undermine A.R.'s account of the sexual assault. While Dr. Hanna did not see "much" evidence of internal trauma to A.R.'s vagina, as defendant points out, Dr. Hanna *did* observe external "redness" to the labia and

associated "tenderness" that were consistent with a forcible sexual assault.

¶ 123   Defendant is correct that Dr. Hanna "did not recover" the tampon A.R. claimed she had in her vagina, but on the question whether it might have been removed before her exam and what might have happened to it, Dr. Hanna "would defer *** to the nurse" who met with A.R. and collected the evidence beforehand. And for what it's worth, Dr. Hanna did observe menstrual blood in A.R.'s vagina.

¶ 124   Lastly, A.R. claimed that defendant cut her wrist "a little bit" when he removed the zip ties, but Dr. Hanna did not observe a knife wound. Nor was there any blood (or DNA) on the knife when the police found it almost two weeks later.

¶ 125   A.R. pointed to the wound in question on a photograph. Perhaps she confused an abrasion caused by the zip ties with a minor laceration caused by the knife. That hardly undermines her overall credibility. There is no question that defendant had a knife in his SUV, and whether or not he nicked A.R. when he removed the zip ties is immaterial. And to be clear, Dr. Hanna did observe abrasions on A.R.'s wrists that were consistent with the use of zip ties—as well as fresh blood in her anal canal and injuries to her feet. In sum, she was visibly "injured both physically and emotionally," in ways that were clearly consistent, in the doctor's medical opinion, with a forcible sexual assault.

¶ 126   Defendant also correctly notes that his cell phone did not contact a tower on the south side during the relevant timeframe. But that is not nearly as significant as he makes it out to be. For one, his cell-phone records did not show *any* activity at the relevant times. (Special Agent Raschke noted that defendant's use of the Lyft app would not show up in the type of records

provided by his carrier in 2017.) It was possible, in Special Agent Raschke's view, that defendant's phone was somewhere without any cell service. But it was also possible that the battery ran out or that the phone was otherwise turned off. The cell-site records alone could not answer this question. Notably, when the police tried to track defendant's phone on the night in question after A.R. reported the sexual assault, the phone appeared to be turned off.

¶ 127 The jury did not need location records for defendant's phone to know where defendant was at the relevant times. A wealth of undisputed evidence put him with A.R., as her own cell phone contacted towers along exactly the path she described—from the bar in River North, to the south side, and back north to the Belmont-Ashland intersection in Lakeview. Defendant has never disputed that he was A.R.'s Lyft driver, and the Lyft records and video footage (from the bar's surveillance camera and the speed camera at the intersection) further confirm that A.R. was in defendant's SUV. So the gap in his cell-phone records is hardly exculpatory.

¶ 128 Defendant claims the other-crimes testimony offered by K.B. was "undercut" by the fact that K.B. "got into [defendant's] car willingly." No, she did not. Defendant "blocked" her path, as she passed by his car, and told her to get in. Her experience on the street told her that "it was best to just listen and not try to fight in that moment." She was perfectly clear that she "did not want to" get into defendant's car, "but it seemed like the only option [she] had at the time." In other words, K.B. acquiesced out of fear of what defendant might do to her. Later, A.R. would do much the same. Neither victim did anything "willingly."

¶ 129 Yes, K.B. was an addict when she encountered defendant. And no, there was no semen or blood found in defendant's SUV after A.R. claimed that she was sexually assaulted in the back

seat. We grant defendant these points. But they hardly undercut A.R.'s testimony.

¶ 130   And even if all of defendant's retail points had succeeded on their own terms, they did not coalesce into a coherent and plausible theory of the case. We are mindful that the burden falls entirely upon the State. That said, a defense theory cannot realistically hope to prevail if it does not allow the jury to make sense of the available evidence. Defendant's proposed theory falls far short of this mark.

¶ 131   Start at the beginning: A.R. ordered a Lyft ride from River North to Lakeview. Defendant took her on a two-hour odyssey to the south side—with a stop in the proverbial dark alley, on A.R.'s account. Along the way, he recorded himself staging a bizarre and frankly suspicious conversation with his passenger, in which he took pains to dismiss her evident fear of dying that night as sheer hysterics. What was defendant up to, if not what A.R. claimed?

¶ 132   And what about A.R., for that matter, under defendant's theory? Was she already setting the table, in a conversation that *defendant* chose to record, for what can only be described as a frame-up for a sexual assault that defendant did not commit? If so, the frame-up was awfully bold and elaborately executed. As defendant approached a red light at Ashland and Belmont Avenues, A.R. fled the SUV—in the middle of a major intersection and at 1:00 in the morning. She left her cell-phone behind, in the possession of a perfect stranger, and jumped into the car of another perfect stranger. Quite the daring—if not utterly reckless—move for an unaccompanied young woman, all of five feet tall and 115 pounds. If A.R. was not fleeing *from* a sexual assault, she could have been running headlong *into* one, for all she knew, in her supposed effort to gin up a case against her Lyft driver—for who knows *what* reason. The notion is ridiculous.

¶ 133   It may be true, as defendant says, that the case "boiled down to whether the jury found [A.R.] credible." Given the overall arc of her story and the corroborating evidence, it is hard *not* to find her credible on the essential points. Emphasizing that the Y-STR analysis alone could not establish a sexual encounter barely moves the needle, if at all, on the question of her credibility. The DNA analysis was consistent with A.R.'s allegations, and given the evidence as a whole, that was more than enough for the State's purposes.

¶ 134   The defense was hemmed in, on all sides, by mutually corroborating evidence and the testimony of a credible victim. Regardless of whether counsel argued that there was *no* sexual encounter or a *consensual* one, the prospects for an acquittal remained equally bleak. We are thus confident that the verdicts resulted from the strength of the evidence and not from counsel's choice of defense theory. Defendant has not established *Strickland* prejudice.

¶ 135                              CONCLUSION

¶ 136   The judgment of the circuit court is affirmed.

¶ 137   Affirmed.

---

### *People v. McCoy*, 2026 IL App (1st) 231052

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CR-12238; the Hon. Neera Lall Walsh, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Rachel M. Kindstrand, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Andrew Yassan, and Heather Fahrenkrog, Assistant State's Attorneys, of counsel), for the People. |

---